Buhan, Exr. et al., Appellants, *v.* Keslar et al.

Argued September 28, 1937; reargued October 6, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*George H. McWherter,* for appellants.

*J. Clark Bell,* with him *Albert H. Bell,* for appellees.

OPINION BY MR. JUSTICE SCHAFFER, November 12, 1937:

This is a will contest. The case has been tried twice. On the first trial the jury found in favor of the will. On the second, which we are reviewing, they found against it. The main attack on the trial was directed against a bequest of $5,000 to Rev. G. E. Buhan. He and the two residuary legatees are appellants.

The case was argued before us upon the proposition that the only parts of the will which can be held invalid are the bequest to Buhan and the naming of him as executor, it being contended that the contestants have no interest, since, if the legacy to Buhan is invalidated, it

passes under the residuary clause and not to them as heirs at law. This seems to have been the main question discussed in the court below on the motion for a new trial. The court had submitted to the jury the question, whether the will in its entirety was procured by undue influence, and the further question, whether the writing was the last will and testament of the testator. The latter question was improperly submitted; it is a mixed question of law and fact and the issues should be limited to questions of fact: *Phillips's Est.*, 299 Pa. 415, 149 A. 719; *Duffel's Est.*, 317 Pa. 214, 176 A. 731; *Tranor's Est.*, 324 Pa. 263, 188 A. 292. There was no attempt to show influence of any sort operating upon the testator in favor of any of the legatees other than Buhan. As we view the case, we are not called upon to determine the question actually argued, because our study of the record has convinced us that no evidence sufficient to set aside the will, or any part of it, was produced by the contestants.

In addition to the gift to Buhan, the will contained bequests to the First Methodist Episcopal Church of Mt. Pleasant of $100, to Mabel Leighty $100, to Emma Ellinger, a half sister of the testator, $500, and gave the residue to two of his nephews, John K. Helman and Harry A. Helman.

The will was written by Buhan at the testator's dictation about a week before execution. It was witnessed by two men who were casually picked by Buhan and taken to the testator's house for the purpose of attesting it. They testified they saw the testator sign the document, that he was of sound mind and understanding when he did so, that he procured the unsigned will from a drawer in a table in another room and when he signed it, declared it to be his will. It had been in testator's possession since preparation. After signing, the testator retained possession of it and a few days later put it in his safe deposit box in bank, where it remained until after his death. He had the keys to the box and

apparently no one else had access to it. He could have changed its provisions or destroyed it at any time. He died about seven months after the will was executed.

Buhan was the minister of the Methodist Church in Mt. Pleasant, to which testator belonged. More than three months before the execution of the will the testator's adopted daughter died and he was left alone. He was about 82 years old. Because he was one of his parishioners and was left alone following the daughter's death, Buhan took an interest in him, paying him frequent visits. The testator had relatives, the closest being half brothers and sisters. With some of them he apparently maintained but little connection, they living in California. One of his sisters, who lived in South Dakota, he made a beneficiary under the will in the sum of $500. There is evidence in the record to the effect that he desired none of his property to go to relatives who lived in California. His estate amounted to about $10,000.

According to the testimony of Buhan, the testator opened with him the subject of making a will. Buhan suggested that some one else write it. This did not meet with testator's approval. Buhan, at testator's request and from his dictation, prepared a first will, which was not executed, because it contained a provision for a tombstone, which was unnecessary by reason of the fact that testator, pending its execution, arranged for the tombstone for which he subsequently paid. The will here in question was then written by Buhan, likewise at testator's dictation, and, as has been noted, contained a bequest to him of $5,000, and named him executor. He was present when the will was executed. He testified he in no way influenced the testator in making the will, and that it embodied the latter's own desires, that he only took an interest in his affairs as he was asked to, and that the reason for giving him the $5,000 was in order that he might educate his three children. There is noth-

ing in his testimony to indicate that he influenced the testator in any way.

When account is taken of the facts, that testator signed it and declared it to be his will, that entirely disinterested persons witnessed it, and that after it was written he kept it in his own possesion until he died, there would have to be far more proof than this record discloses to invalidate it.

No worth while purpose would be served by setting down all the legal principles which govern cases of this character when the issue is one of undue influence. In two cases decided by us this year, *Cookson's Est.*, 325 Pa. 81, 188 A. 904, and *Geist's Est.*, 325 Pa. 401, 191 A. 29, we have encompassed practically the whole field of the law, where it is sought to set aside a will on that ground. Applying the rules which these cases lay down, the verdict against the will cannot be sustained. The testimony brought forward to set it aside consists almost entirely of declarations of the testator. There was no proof worthy of consideration indicating that he was not of sound mind and did not possess testamentary capacity. The overwhelming weight of the evidence shows that he was competent, clear minded and thoroughly understood what he was doing, what his estate consisted of, who were his relatives and what he wished to do.

Declarations alleged to have been made by a testator cannot have any force in establishing the substantive fact of undue influence. "Declarations of the testator that he did not execute his will freely, that he never intended to have made such a will, and never should, but for the influence of those persons in whose favor it is made, and similar declarations, which are very common in the testimony elicited in testamentary causes, can be of no force whatever as testimony tending to establish the truth of the declarations. In that light, such declarations are mere hearsay, depending for their force upon our confidence in the veracity of the person making them, and in most cases easily explained, without

regard to the question of their truth, and have always been rejected as evidence": *Herster v. Herster,* 122 Pa. 239, 254, 16 A. 342. Declarations of a testator tending to show undue influence must be supported by other testimony of the fact: *Keen's Est.,* 299 Pa. 430, 149 A. 737; *Cookson's Est.,* supra.

A summarization of the testimony impugning the validity of the will is as follows: One witness said testator told her Buhan wanted him to make a will and would like to have everything testator had, if he could get it. She also said testator told her Buhan was "bossy." A half sister of his adopted daughter said testator stated to her that Buhan wanted him to make a will and drew a will for him to sign, and he would not sign it, that he later drew the one he did sign; that when provoked at Buhan, testator told her he would change or tear the will up which he had signed, and would not give him the $500 he had provided for him. She never heard him say he had given Buhan $5,000. She also testified that testator told her Buhan "bossed" him about making a will, and that when testator was in the hospital he said as soon as he got out, he would tear up the will and Buhan would not get the $500. A third witness recounted that testator told him Buhan wanted him to make a will and wanted $500 for settling his estate, that he thought this too much but finally consented; that testator never said anything to him about a bequest of $5,000, and declared that Buhan was "bossing" him to make a will, that Buhan had written one and he had signed it and finally consented to give him $500, although he thought it too much. Another, called by contestants, stated that following the death of his adopted daughter testator asked him to recommend some one to prepare his will. Buhan was present in the house with him and both advised testator to have a will drawn. Subsequently testator told him that Buhan had drawn a will, which he refused to sign, and under it Buhan would get more than anyone else. Still another witness

said testator told her Buhan had written a will, which he would not sign, and then had written another, which he did sign, under which Buhan would get more than anyone else, that he mentioned $500, but never mentioned $5,000. Another witness said testator told her he had made a will with which he was dissatisfied and left Buhan $500, which included his services for settling the estate. And another recited declarations by testator about having signed a will giving Buhan $500, and that Buhan was always prying into his affairs and wanted to find out how much money he had. He told her he wished Buhan would quit "bossing" him. Other witnesses testified to somewhat similar declarations.

In Buhan's behalf, witnesses testified testator had told them, shortly before his death, that he had made a will, that it was in his safe deposit box in bank, and that he spoke kindly of Buhan and said he had been very good to him. The tombstone dealer testified testator told him at the time he was making arrangements about the tombstone, which cost $600, that he did not want any of his money to go to his relatives in California. This was also the evidence of another witness, who worked for testator for five or six weeks before he died. To her he said that Buhan was his very good friend and when he wanted help he called on him. She frequently telephoned at testator's direction for Buhan to come to him.

Evidence embodying declarations such as appellees brought forward would be a dangerous kind of testimony on which to invalidate a will, executed as this one was, and kept in the possession of the testator. He was not living to confront the witnesses and to contradict them or to explain. If he had been on hand, an entirely different aspect might be given to the testimony, as for instance, witnesses who testified he said he had given Buhan $500 might have misunderstood, or it might well be that the testator, as have other makers of wills, purposely misled the witnesses by telling them he had given

a less sum than he actually had. As before pointed out, such declarations cannot be received for the purpose of establishing the substantive facts which they carry. The testimony in this respect is hearsay.

In *Herster v. Herster,* supra, which is a landmark in the law of contested wills, it was said (p. 256) : "In order that the declarations of the testator may be considered at all, upon an issue of undue influence, there must be proof of other facts and circumstances indicating circumvention or fraud in the procurement of the will. . . . for they are received, not as proof of the fact, but merely to show that there are special grounds for apprehending and unusual opportunities for exercising undue influence, and to illustrate the effect of such influence after its existence has been established; . . . The weakness of mind and consequent susceptibility to influence which is admissible in such a case, must be shown to exist at the very time of the testamentary act; whilst the testator's declarations directly show only the state of his mind when they are made." In *Keen's Est.,* supra, p. 439, we ruled that, "Declarations of testator tending to show undue influence . . . must be supported by other evidence. . . . There is not a word of evidence that it [the will] was procured by any undue influence or improper means, aside from the alleged statement of the testatrix to Caroline Kalish, which statement, unless accompanied by other proof, is of no moment."

The broad principles which apply to this controversy and others of like kind are these: " 'In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will' ": *Keen's Est.,* supra, p. 435. "To set aside a will on this ground

[undue influence] where the testator is in full possession of his faculties and his testamentary capacity admitted or established, the evidence must be clear and strong. Mere opinions or suspicions or belief not founded on facts testified to will not be sufficient": Ibid., p. 436. "The burden rested upon the contestant . . . to prove both undue influence and lack of testamentary capacity. The invalidity of a will for these reasons must be established by the manifest weight of evidence, and the testimony as a whole must support the verdict. In such an issue the judge acts as a chancellor and should not permit the finding of a jury to stand which is contrary to the weight of the evidence": *Cookson's Est.,* supra, p. 86.

*Geist's Est.,* supra, is a controlling authority in this case. There, a testatrix, very ill, gave a large part of her property to her physician, who was the scrivener of the will, and was appointed executor of it. We pointed out that the burden of proving undue influence rests upon the contestant, and shifts to a proponent, who occupied a confidential relationship to the testatrix only where there is evidence of weakened intellect. We reëmphasized what has been said in other cases (p. 403) that, " 'The concern of the law is the protection of the testator and the legal objects of his bounty, to see that he has testamentary capacity, and is not overreached by designing persons. To this end, in the trial of an issue to determine the validity of a will, the judge sits as a chancellor . . . the evidence is addressed quite as much to him as to the jury, and he cannot permit the jury to do what he, as a chancellor, would not do.' "

Applying these principles, we are compelled to hold that the evidence produced to invalidate the will was insufficient.

Judgment reversed, with directions to the court below to enter judgment in plaintiffs' favor.