## May *v.* Fidelity Trust Company, Appellant.
## Frank Will.

Argued October 2, 1952; reargued April 23, 1953. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

*Earl F. Reed,* with him *Kenneth G. Jackson, James S. Crawford, III,* and *Thorp, Reed & Armstrong,* for appellants.

*John C. Bane, Jr.,* with him *Donald B. Heard, Walter T. McGough* and *Reed, Smith, Shaw & McClay,* for appellees.

Opinion by Mr. Justice Allen M. Stearne, October 15, 1953:

The appeals are from a judgment of the Common Pleas Court of Allegheny County *non obstante veredicto* in favor of proponents in a will contest. The issue was *devisavit vel non.* The verdict of the jury was in favor of contestants, who alleged undue influence.

The cogent relevant testimony may be stated with comparative succinctness, despite a trial which took ten and one-half days. There are 184 exhibits with a printed record of 1816 pages. The detailed narrative of facts may be found in the opinion of the hearing judge in the orphans' court refusing an issue (printed in supplemental record), in the majority opinion of that court reversing the hearing judge, and in the opinion of the court in banc in the common pleas entering judgment for proponents n.o.v.

The decedent, Anna A. Frank, a widow, died April 11, 1947. Her heirs and next of kin were a daughter, Florence F. May (a proponent) and two minor grandchildren, Stephanie Frank and Ann Frank (contestants), children of a deceased son, Herbert I. Frank. The daughter Florence is married to Harry L. May

and has two children, Herbert L. May and Marion May Linton (also proponents).

The personal estate of decedent is said to aggregate approximately $600,000. Any ownership of real estate is not disclosed by the record. Decedent left a will dated February 6, 1946, prepared by an attorney, executed by her and witnessed by the lawyer-scrivener and his secretary. Under its provisions $1,000 was bequeathed to a cemetery association for perpetual care of the burial lot. All clothing, furniture, household goods and personal effects were bequeathed to decedent's daughter Florence. The residue was divided as follows: two thirds absolutely to the daughter Florence. The remaining one third was placed in trust for the daughter's two children, Herbert L. May and Marion May Linton. There are contingent provisions relating to possible deaths of the daughter and her two children without leaving issue, whereupon the daughter's husband, Harry L. May, is given a life estate with remainder to surviving children of the deceased son (the contestants). In the event of the death of such named beneficiaries, the trust estate is passed to decedent's niece and nephew.

Except for the remote recited contingency, contestants, the children of her deceased son, Stephanie and Ann, were disinherited. By the fourth item of the contested will decedent stated: "I having heretofore made substantial gifts to Stephanie Frank and Ann Frank, children of my deceased son, Herbert I. Frank, and being satisfied they will also be assured of ample funds from the estate of my deceased husband, Abraham Frank, I therefore give, devise and bequeath [as recited above]."

The daughter Florence was named as executrix, and in case of her inability to act then testatrix's son-in-law, Harry L. May, was substituted. Should both be

unable to act decedent directed that a trust company be selected in the manner indicated by the will.

In the opinion of Judge KENNEDY speaking for the court in banc when entering the judgment n.o.v., it is stated: "The contestants have conceded the testamentary capacity of Anna A. Frank since early in the hearing in the Orphans' Court. The contestants at this trial also conceded that the testimony in their behalf did not warrant a conclusion that Anna A. Frank was, at the time of the execution of the will, or any time thereafter, a person of greatly weakened intellect, considering her age and physical disabilities, and therefore agreed that the burden of proving undue influence, misrepresentation, etc., remained with them."

The accuracy of Judge KENNEDY'S statement is supported by the opinion of decedent's family physician and contestants' witnesses, referred to in the opinion as follows: "[The doctor] did state that except for the few occasions when Mrs. Frank was in a diabetic coma, that she remained mentally strong and alert, considering her age and her physical ailment, up until the time of her death. It might be here mentioned that all of the contestants' witnesses agreed that Mrs. Frank was a woman of high intelligence and mentally strong."

It is freely conceded that Harry L. May, the son-in-law (a proponent), the lawyer who *drafted* the will, occupied a confidential relation toward decedent. In the opinion of the court in banc it is said: "It was clearly shown that by [May's] own testimony, and his own admission that he stood in a highly confidential relationship with Mrs. Frank."

The testimony must be reviewed in the light of the conceded facts that decedent possessed testamentary capacity, and her *mind* was not weakened either by mental or physical affliction, and that the husband

of the chief beneficiary and the father of the other two legatees, occupied a confidential relation toward decedent.

According to the testimony of Mr. and Mrs. May, after her son's death on January 5, 1946, decedent informed them that she desired to make a new will; that she took her former will of 1936 wherein her son, to his dissatisfaction, was given but a life estate in one-third with remainder to contestants; and that decedent went over the will with the Mays item by item. Decedent informed them that she did not want any of her money to go to the family of the widow of the son and that she was not leaving anything to contestants because with their shares in her late husband's trust and under their father's will they would be amply provided for. Mr. May testified that he made elaborate notes of her instructions. Later in his office in Steubenville, Ohio, Mr. May testified that he drafted the will in accordance with her instructions and on February 2, 1946, he went over the draft with decedent item by item, and every paragraph was carefully discussed and explained. He further testified that he requested decedent to call her bank and have them recommend a Pittsburgh firm of attorneys. Decedent did this and one of the leading firms of Pittsburgh, that of Reed, Smith, Shaw and McClay was selected. Mr. May testified that a lawyer in Steubenville told him that James H. Beal, Esq., was a member of that firm; in consequence Mr. May telephoned Mr. Beal and arranged for his firm to write the will of decedent according to the draft of the will to be forwarded to the firm. Following such telephone conversation the following letter was sent:

"Harry L. May
Attorney at Law
Steubenville, Ohio

February 4, 1946

"Reed, Smith, Shaw & McClay,
747 Union Trust Building,
Pittsburgh, Penna.,
Attention James H. Beal, Esq.,
Dear Mr. Beal:

"In accordance with our telephone conversation this afternoon, I am enclosing herewith carbon copy of will of Anna A. Frank of Pittsburgh.

"I would request that you have an origional [sic] and two carbon copies made in your office and Mrs. Frank and myself will be present for execution of the same on Wednesday February 6th at 2:00 P.M.

"As explained to you in our conversation, I, being a son-in-law of Mrs. Frank and my wife and children being beneficiaries under this will, do not desire the slightest question being raised as to undue influence or otherwise; hence deemed it proper that the matter be consumated in your office in order that whoever you may delegate to take care of the same in your absence will be in position, if necessary, to so testify.

"Please understand I do not anticipate any question arising regarding this matter and am only taking this course in order that there can be no possible criticism on account of my preparing the will which was done at the express request of Mrs. Frank.

"Trusting to have the pleasure of meeting you personally at some time in the near future, I remain

Very truly yours,
(s) Harry L. May
Harry L. May

M/m enclos."

At the appointed day and hour Mr. May together with his son accompanied decedent to the office of Messrs. Reed, Smith, Shaw and McClay where they met Frank W. Ittel, Esq., who had been delegated by the firm

to perform this professional service. Neither decedent nor Mr. May had ever met either Mr. Beal or Mr. Ittel before this time. Decedent was conducted by Mr. May into Mr. Ittel's office. It was testified by Mr. Ittel that for approximately an hour he went over the will with decedent alone in his office. He said that decedent told him what she wanted to do with her property and who were the members of her family and why she was making this testamentary disposition; she also told him the reason for her exclusion of contestants because they would jointly receive from decedent's husband's trust and from their father approximately $1,000,000. Mr. Ittel further testified that after going over the will carefully with decedent she expressed her satisfaction with it. Mr. Ittel then called in his secretary, Miss Esther S. Schucker. Decedent executed the instrument and Mr. Ittel and the secretary signed it as witnesses in her presence and in the presence of each other. As subscribing witnesses they later proved their signatures at the probate of the will.

After executing the will decedent, in company with Mr. May and his son, went to the trust department of the Union Trust Company, in the same building as the offices of Reed, Smith, Shaw and McClay. She there left the will, and took a receipt, and the document was placed in the bank's vault for safe keeping. The following day the bank mailed a letter to decedent, acknowledging receipt of the new will and enclosed the old 1936 will. The will remained in the bank until after decedent's death on April 11, 1947 (about fourteen months). Meantime decedent had retained a carbon copy of the will.

The testimony on behalf of contestants in support of their allegation of undue influence is wholly circumstantial. No witness of either proponents or contestants testified that Mr. or Mrs. May had ever men-

tioned in their hearing the subject of will or testamentary disposition. Certainly no evidence of importunity to make any testamentary disposition by any of proponents appears in the record. The circumstantial evidence is substantially as follows: Decedent's maid, Minnie Byrd, said Mrs. May was "always bossy and domineering" toward her mother; that in April or May 1946, after the Mays left, decedent said to her, "The May's made me do something, and won't let me change it." Also, "I would like to change my will, but, they will think I am crazy." Gertrude Tucker, a nurse, testified that in January, 1946 she heard loud talking coming from the living room (where decedent was with her daughter and son-in-law) and later said decedent told her "that she wished she could undo what she had done." Agnes Maloney, another nurse, said that Mrs. May was importuning her mother to give her a *letter of attorney* to sign checks but that decedent refused to do so. Ina Johnson, a nurse, testified that Mrs. May was rude, abrupt and argumentative with her mother. She also testified that she had found torn check stubs in a waste basket after decedent's death, indicating that checks had been drawn by decedent to the order of the son's widow and to contestants, but had been destroyed by the daughter. There was also testimony that one of the contestants had endeavored to cash the checks at the bank, the day after the death, but could not do so because of decedent's death. Catherine Dillon, another nurse, who daily bathed and massaged decedent, said that on the day, February 6, 1946, when decedent executed the will, she was crying and unsettled and said she was going to town with Mr. May and her grandson because "she had to go." Elizabeth Boe, a nurse at a hospital where decedent was a patient from October 17, 1946 until early January, 1947 testified that the daughter

Florence was a patient in another room in the hospital and telephoned her mother, permitting her to believe she was in Steubenville; that she directed the nurse not to permit the son's widow to visit her mother except in the presence of a member of the May family; Lila C. Carney, a beautician, said she heard frequent arguments between the mother and daughter *but on cross-examination did not relate a single incident wherein the daughter had prevailed.* She also testified that the daughter, after the death, attempted to bribe her to become proponents' witness. Dennis Robinson, decedent's chauffeur, testified that the daughter was bossy and domineering toward her mother; Marie Labuda, a hospital nurse, heard the daughter call her mother "an old fool" and that when her mother would not do as the daughter wanted she would use profane language towards the mother. Mr. Ruslander, a highly reputable member of the Allegheny County bar, who had been decedent's attorney, testified that after the son's death he made a condolence call, and she told him that she knew of her late son's dissatisfaction with the 1936 will but that she was going to correct this by a codicil or by gifts. The above testimony constituted the basis of this will contest.

In our recent decision of *Williams v. McCarroll,* 374 Pa. 281, 97 A. 2d 14, Mr. Justice BELL exhaustively reviewed the field of will contests: when issues *devisavit vel non* should be granted or refused, the functions of hearing judges and of juries in such issues, and when, after a trial and verdict, a judgment *non obstante veredicto* should be entered or withheld. The pertinent statutes and cases were cited and discussed.

The measure of testimony requisite to establish the existence of undue influence sufficient to set aside a

will is imprisonment of the body or mind, fraud, threats, misrepresentation, circumvention, inordinate flattery, physical or moral coercion such as to destroy decedent's free agency and to operate as a present restraint. *Phillips' Estate*, 244 Pa. 35, 90 A. 457, frequently cited, is probably the leading case expounding this doctrine.

And, as in the present case, where decedent's testamentary capacity is conceded and there is no evidence of weakened intellect, either because of mental or physical affliction, the burden is upon those who assert undue influence to prove it *even when the bulk of the estate is left to one occupying a confidential relation*: *Phillips' Estate*, supra, p. 44, with the many cases therein cited. See also *Ash Will*, 351 Pa. 317, 41 A. 2d 620; *Quein Will*, 361 Pa. 133, 145, 62 A. 2d 909; *Snedeker Estate*, 368 Pa. 607, 84 A. 2d 568; *Roberts Will*, 373 Pa. 7, 17, 94 A. 2d 780.

The right of a trial court to enter judgment *non obstante veredicto* has been so well established that discussion seems superfluous. Such right, and the nature of judicial consideration in weighing the evidence has been well stated by Mr. Justice JONES in *Stewart Will*, 354 Pa. 288, 47 A. 2d 204, where he said, p. 294: "We do not agree, however, that, in passing upon the proponents' motion for judgment n.o.v., the court below was required to view the verdict on the basis of the facts and inferences most favorable to the successful party. (Compare Morrish Estate, 156 Pa. Superior Ct. 394, 40 A. 2d 907.) Such is the rule in an action at law where the jury is the sole judge of the facts. But, in the trial of an issue *devisavit vel non*, where the trial judge sits as a chancellor, his conscience must be satisfied with the justness of the verdict on the basis of all of the evidence. If the chancellor is not so satisfied, he may set aside the verdict

even though it might otherwise be found sustainable solely upon the facts and inferences most favorable to the verdict."

In *Guarantee Trust & Safe Deposit Co. v. Heidenreich,* 290 Pa. 249, 138 A. 764, Justice WALLING said to the same effect, p. 251: "In [trial of issue d.v.n.] the judge sits as a chancellor, and the question is not whether some of the evidence taken by itself would support the verdict, but whether it would when considered as a whole: Fleming's Est., 265 Pa. 399; Keller v. Lawson, 261 Pa. 489. Testamentary incapacity must be established by the weight of the evidence (Lawrence's Est., 286 Pa. 58; see also Sharpless's Est., 134 Pa. 250) ; here it clearly is not. To the chancellor the verdict is advisory; hence, in such case, the rule that all evidence in support of the verdict must be taken as true and all opposed must be rejected is not applicable. Of course, where the facts were for the jury the verdict should not be lightly set aside; but here, the proof taken as a whole was not sufficient to overcome the presumption of testamentary capacity and the case should have been withdrawn from the jury. See Tetlow's Est., 269 Pa. 486. To warrant submitting such contest to a jury there must be such a substantial conflict in the evidence as to support a verdict for either side. See Fleming's Est., supra; Phillip's Est., 244 Pa. 35; Roberts v. Clemens, 202 Pa. 198; also Brehony, Exr., v. Brehony, 289 Pa. 267." See also: *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487; *Shuey v. Shuey,* 340 Pa. 27, 16 A. 2d 4.

*Williams v. McCarroll,* supra, has so thoroughly discussed these principles and cases, including those which are herein cited, that we need not elaborate further.

Applying then these legal principles to the facts of this case it clearly appears that contestants have

not met the burden of proof cast upon them, which burden their able counsel frankly accepted. The evidence falls far short of establishing that the proponents substituted their own minds for that of decedent through fraud, deceit or undue influence. Contestants wholly failed to prove, as they were required to do, that the son-in-law, or his wife, or their daughters unduly influenced the decedent in the making of this will. And even though such rule of law concerning the burden of proof had been to the contrary, Mr. May fully met the burden. There was not the slightest indication that Mr. May and Mr. Ittel, or his associates, acted wrongfully or in collusion in order to secure the execution of the will. Decedent was not required to make an equal division of her estate. In the absence of wrongful action on behalf of proponents, which was not proven, the reason which decedent assigned for her failure to equalize distribution must be accepted. Contestants' testimony analyzed reveals nothing but the existence of suspicion and conjecture, which we have so repeatedly stated does not constitute probative fact.

The judgment is affirmed.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE HORACE STERN:

The result reached by the majority of the court in this case is so contrary to what I conceive to be right and proper, and does such injustice, as I firmly believe, to the two grandchildren of the testatrix who have been disinherited, that I cannot do other than record my earnest dissent.

The voluminous record reveals a sordid story of family discord, avarice and intrigue. The jury, which

for two whole weeks had patiently heard a great array of witnesses, followed by an unimpeachable charge of the court, obviously had no difficulty in concluding that Mrs. May, the daughter, and Mr. May, the son-in-law, of the testatrix, had exercised a dominating control of her mind and volition, whereby they secured for themselves and their own children the very large estate of the testatrix to the exclusion of the two children of her deceased son,—grandchildren who, as will be shown hereafter, she actually adored. The majority opinion is apparently based largely on the proposition that there were no auditory witnesses who sat in at any interview between the Mays and the testatrix, and that therefore there was lacking any direct evidence of the perpetration by them of any improper influence. But in how many cases involving a charge of undue influence did a witness actually see or hear it being exercised? It may be repeated here what was said in *Freed's Estate*, 327 Pa. 572, 577, 195 A. 2d 22, 24: "While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can—and in a case such as the present must—recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it, and in which appellant, the sole beneficiary, played such a ruthless and dominating part."

The court below, in what impresses me as a wholly unjustified exercise of authority, (and I shall discuss later its power in that regard) vacated the verdict of the jury and entered judgment n.o.v. for the proponents. In my opinion neither that court nor the present majority opinion of this court has adequately recited or analyzed the significant and vital facts which

must have appealed so convincingly to the twelve members of the jury. I have no particular quarrel with the majority opinion's statement of the applicable *law*. It concedes that the testatrix's son-in-law, Mr. May, who prepared and wrote the will, and who admitted that he was acting in that operation as her lawyer, occupied a confidential relation to the testatrix. It is true that the opinion intimates, if it does not directly state, that this fact did not impose upon him the burden of showing that no improper influence controlled the making of the will, and this because there was no claim that the testatrix's intellect had been weakened. It might readily be pointed out in that connection that bodily infirmity may well render one quite as amenable to undue influence as weakness of mind, since a person suffering from grievous physical disability is not likely to be any better able to withstand the pressure of argument and coercion by a dominant personality but, on the contrary, would be more resigned to seeking peace at any price; indeed the authorities recognize this and declare that, even though a person has testamentary capacity, if he is so *physically infirm or* mentally weak as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the *latter* to show that no improper influence controlled the making of the will: *Phillips' Estate,* 244 Pa. 35, 43, 44, 90 A. 457, 460, 461; *Schwartz's Estate,* 340 Pa. 170, 173, 16 A. 2d 374, 375; *Lewis Will,* 364 Pa. 225, 233, 72 A. 2d 80, 85. However, the point need not be labored here, since, even if the burden of proof to establish undue influence was upon the contestants, I am firmly of opinion that that burden was so clearly sustained by the testimony that, had the verdict of the jury been other than it was, the court below would have been obliged to set it aside and,

had it failed to do so, that duty would have devolved upon this court.

In the light of our decisions I do not challenge the power of the trial judge, sitting as a chancellor, to set aside the verdict of the jury in cases such as this if, as stated in *Stewart Will*, 354 Pa. 288, 295, 47 A. 2d 204, 207, his conscience is not satisfied with the justness of the verdict on the basis of all of the evidence. But that does not mean that he is a law unto himself and that the workings of his conscience cannot be reviewed. On the contrary, the authorities are clear to the effect that his discretion in such cases is,—as in all other cases—not unlimited, and that his decision should be reversed in this court if, in our opinion, the discretion has been abused: *Dible's Estate*, 316 Pa. 553, 175 A. 538; *DeLaurentiis's Estate*, 323 Pa. 70, 78, 186 A. 359, 363; *Lare Will*, 352 Pa. 323, 330, 42 A. 2d 801, 804; *Williams v. McCarroll*, 374 Pa. 281, 299, 97 A. 2d 14, 22.

I proceed therefore to a statement and consideration of the various phases of the testimony. I think it will clearly appear that the action of the court below in upsetting the jury's verdict was wrong and unjustified.

(1) *The physical condition of the testatrix.*

Between 1932, when her health commenced to deteriorate, and the time of her death in 1947, the testatrix suffered five cerebral hemmorhages or paralytic attacks. One of these caused a partial paralysis of her left side, another a weakness of her right hand and leg, another a mental confusion and difficulty in walking, another a permanent paralysis of her right side. In addition to these frightful strokes she suffered all the later years of her life from severe diabetes mellitus and arteriosclerosis, requiring her hospitalization on at least three occasions. The sudden

and tragic death of her beloved and only son, Herbert, on January 5, 1946 (which was just a month before the execution of the will here in controversy) left her gravely shocked, grief-stricken, and physically and mentally exhausted, her condition being such that she was confined to bed for two weeks and her attending physician was much concerned. Her emotional instability and tension continued until and beyond the writing of her will. Her blood sugar rose on even the slightest excitement and she was repeatedly warned by her physician to avoid any nervous disturbance. She was in constant need of anti-spasmodics and sedatives. Her doctor—a physician of the highest standing in the professional circles of Pittsburgh—testified that, in his opinion, her physical condition and emotional state engendered by her son's death made her amenable to great pressure by which she might be led to do things she would not have done had her condition been normal.

Such, then, is a picture of the weak, suffering and distracted victim of a wholly undue pressure exerted upon her to induce her to make her highly unnatural will.

(2) *What possible reason could the testatrix have had for disinheriting the two beloved children of her deceased son in favor of the children of her daughter?*

This question is the one which naturally is the first to arise in the consideration of this case. What possible reason? Ever since their birth the testatrix had been devoted to these two grandchildren. One of them was named after her. They visited her frequently. She was proud of them. After her son's death she expressed herself as being worried what would become of them. She manifested at all times profound interest in their schooling, their clothing, and their social lives. She gave them gifts from time to time and on

one occasion gave an automobile (over the strenuous opposition of Mrs. May) to one of them. When they came to see her she hugged them. All the testimony is to the effect that she idolized them. Why did she disinherit these two young girls in favor of the adult May children? Mr. May, the lawyer son-in-law, who undertook to advise her in regard to her will and actually drafted it, thought it advisable to write into the will of his own accord, and not at the instigation or instruction of the testatrix herself, an alleged reason. It is no wonder that he thought this advisable for appearance sake, since he was acting as lawyer-scrivener of a will in which, of an estate of the value of approximately $600,000, two-thirds was being bequeathed to his wife, with a contingent reversion to himself, and the remaining one-third to his children, and with the two children, Stephanie and Ann, standing in the same relation to the testatrix as his own children completely disinherited, and with his wife named as sole executrix. Mr. May, as will later further appear, was extremely conscious of the fact, and disquieted by it, that his conduct and that of his wife were such as were bound to give rise to the charge of undue influence. But, ironically enough, the "reason" which Mr. May thus wrote into the will in an attempt to explain such an obviously peculiar action on the part of the testatrix was transparently false and even ridiculous. What Mr. May wrote was as follows: "I having heretofore made substantial gifts to Stephanie Frank and Ann Frank, children of my deceased son, Herbert I. Frank, and being satisfied they will also be assured of ample funds from the estate of my deceased husband, Abraham Frank, I therefore give, devise and bequeath all the rest, residue and remainder of my estate" etc. (to the May family). But apart from the fact that the testatrix, well knowing, of course, of what Stepha-

nie and Ann were thus "assured," had nevertheless in all the wills she had previously written provided in none of them for less than one-third of her estate to go to her son and then to his children,—apart, I say, from that fact, the May children had received at least as much as these two children as gifts from the testatrix during her lifetime, and the May family shared equally in the Abraham Frank Estate. Indeed, without burdening this opinion with the detailed figures, the fact is that, of the moneys descending from the testatrix (if her present will is sustained) and from her deceased husband, the May children will ultimately acquire and succeed to the sum of approximately $1,750,000; the two children of Herbert, on the other hand, will ultimately acquire, of all the moneys similarly descending from the testatrix and her husband, a maximum amount of approximately $880,000. It is needless, therefore, to point out the absurdity— not to say effrontery,—of the attempt to give such an obviously sham justification for testatrix's leaving the one-third portion of her estate to her daughter's children (after having given their mother the other two-thirds), and nothing to her son's children, on the ground that the latter were amply provided for, notwithstanding the fact that the May children, to whom the one-third of the estate was being given, were *twice as well* "amply provided for"! And Mr. May in face of that same fact, had the boldness to testify that the testatrix told him, as an explanation of her action, that "I think the children (Herbert's children) are well enough taken care of or will be and I see no reason *why your family should not be just as well taken care of.*"!

Extending throughout the testimony of Mr. and Mrs. May there is an attempt to set up another alleged reason why the testatrix disinherited her deceased son's

children, that reason being that she did not want her daughter-in-law Rose to get any of her money. This purported justification for the disinheritance is quite as puerile and obviously false as the other one. It is probably quite true that originally the testatrix looked with disfavor upon the marriage of her son who had remained a bachelor and lived with her until his middle life, but her feeling was against his marrying at all, as is perhaps not unnatural with mothers under such circumstances, and was not directed in any way against the woman he had selected to be his wife. As a matter of fact the testatrix had bought for the married couple a house costing at least $26,000 as a wedding present, and subsequently she gave Rose from time to time gifts aggregating $30,000. The relationship between mother and daughter-in-law was described by all the witnesses who either lived as intimates in the testatrix's household or attended her in her illnesses, as most friendly and affectionate. It was not the testatrix but Mrs. May herself who had animosity against Rose,—an animosity so great that she even tried to prevent Rose from visiting the testatrix (as Rose did nearly every day) whenever the latter was a patient in the hospitals. It was testified that the testatrix phoned to Rose every morning, and on one occasion she expressly said that while she did not approve of the marriage at the time, Rose had turned out to be a wonderful wife and a wonderful mother. Even the trial judge made a finding to the effect that the testatrix had "accepted Rose Buck as her daughter-in-law and that a warm, friendly, and perhaps affectionate relationship had grown up between them." But what is of far greater importance is the fact that the testatrix was not obliged, even if she did desire to prevent Rose from getting any of her money, to disinherit her son's children. Certainly even a first-year law student could

have advised the testatrix that she could make a bequest to a trustee to pay them the income for their lives and, at their death, the principal to their issue or to any other persons she might choose to designate, and without therefore the slightest possibility of Rose sharing in such a legacy. But, as we shall see later, neither Mr. May nor Mr. Ittel did so advise her, the former because he obviously did not want her to have such information, and the latter because it was not his duty nor his function to do so.

Having thus shown the utter futility of Mr. May's attempt to advance reasons for the testatrix's disinheritance of Herbert's children, and that in fact no such reasons could possibly have existed, the question accordingly persists: Why did she do it? What was the pressure exerted upon her that caused her to make such an inexplicable departure from all of her previous wills? But before referring to the testimony that completely answers that question attention is directed to the evidence concerning an occurrence that would seem almost as though providentially designed to point the way to the truth in this case.

(3) *Mr. Ruslander's interview with the testatrix.*

S. Leo Ruslander, Esq., an esteemed and respected member of the bar, had long been an intimate friend of the testatrix and her husband. He was for many years associated in the office of A. Leo Weil, Esq., where most of the testatrix's former wills had been written. In 1930, four months after her son's marriage, she had, in the will then made, given as much as one-half of her estate to her son for life and at his death to his children if any, but in subsequent wills she had left only one-third of her estate to her son and at his death to his children, and Herbert had frequently protested that his family should receive one-half of the estate the same as his sister, Mrs. May.

About ten days after his death, on January 15, 1946, Mr. Ruslander paid the testatrix a condolence visit, and she apparently poured out her heart to him. He had prepared for her, and was of course familiar with, her last previous will in 1936. She expressed to him a feeling of regret that she had provided therein only a third instead of an equal half of her estate for Herbert and his children, said she was sorry she had not changed her will during his lifetime in accordance with his request, and told him she intended to do something about it now that he was dead. So far, therefore, from any wholly incredible intention on her part to cut out Herbert's children now of all times when they had lost their father, she expressed to this intimate confidant her intention to give them even more than the one-third of her estate provided in her previous wills. And yet we are asked to believe that, of her own free volition, only five days later, on January 20 or within a day or two thereafter, in an interview between her and her daughter and son-in-law, without coercion, persuasion or even so much as a suggestion on their part, she not only gave instructions for the preparation of a new will which would not increase the legacy to Herbert's children of one-third of the estate, but, on the contrary, would take even that share away and disinherit them altogether!

There is only one possible clue to this extraordinary situation. It is that the testatrix was subjected to a wholly ruthless badgering and control exercised upon her weakened body and sorely distressed mind, as will hereafter appear.

(4) *Mrs. May's domination of her mother and overpowering of her will.*

It is necessary in a court of justice to state and review the facts, unpleasant as they may be. Ten witnesses, each and every one of them wholly disinterested

and consisting of those who were nearest in the day-by-day life of the testatrix,—her domestic servants, her chauffeur, the nurses who attended her in her illnesses, her physician,—all testified to the coercive influence which Mrs. May exerted upon her mother, not through the medium of ordinary reasoning and persuasion but by the use of abusive language, threats and intimidation, whereby she deprived her not only of her free agency in the general conduct of her affairs, but also ultimately in the writing of her will. As against these witnesses, the Mays did not produce a single person who had any sustained relations whatever with the testatrix,—not one of her relatives, friends or close acquaintances. The servants, the chauffeur, the nurses, all testified to conduct on the part of Mrs. May in her interviews with her mother consisting of outbursts of temper, scorn and vilification, thereby creating an emotional, mental and physical strain beyond the testatrix's endurance and such that after these exhausting sessions she would sob and be so prostrated that her physician was forced to warn Mrs. May against subjecting her mother to these altercations. Mrs. Byrd, the testatrix's personal maid, testified that Mrs. May called her mother a "damned old fool" even at the moment when they were putting her on a stretcher to take her to the hospital, that after Mrs. May's visits the testatrix would be nervous and slump in her chair as if she would just as soon die as live, and would cry for days, and that all the arguments that occasioned this condition were about testatrix's "money, money, money." Mrs. Tucker, a nurse, testified that there was always loud talk and berating of her mother by Mrs. May, and that the night after the very session which occurred sometime between January 20th and 25th at which the alleged instructions in regard to the will were given, the testatrix was deeply agitated, depressed

and crying. Mrs. Maloney, another nurse, testified that the testatrix said to her, "Oh, Mrs. Maloney, if Florence would only leave me alone." Miss Johnson, a nurse, testified that Mrs. May's visits left her mother crying, weak, upset and exhausted, and that it would take two or three days for her to recuperate. She described how, against the testatrix's protestations, Mrs. May insisted on getting from her a power of attorney on a morning when, in the hospital, she was a very sick woman, violently vomiting, tired, sad, discouraged and "weepy." Mrs. Carney, a beautician, who knew the testatrix intimately for twelve years, testified that she told her that "She (Mrs. May) is my own daughter but I hate the way she takes charge of things and takes possession." Miss Labuda, a nurse, testified that there were repeated arguments in which Mrs. May called her mother a fool, indulged in curses, and left the testatrix upset, crying and even vomiting. Robinson, the chauffeur, testified to noisy, boisterous arguments between Mrs. May and the testatrix about money matters.

So much of their relationship in general. It is somewhat significant that in the very face of approaching death, the testatrix was so fearful of Mrs. May's hostility to Herbert's children and so mindful of her continued efforts to prevent them from receiving any of her money, that she secretly telephoned to the assistant Vice-President of the Mellon Bank in order to ascertain whether she could give them checks which would be honored *after her death.*

In her weakened physical condition and depressed state of mind the testatrix could not resist the importunities and domination exercised upon her by Mrs. May.

(5) *Mrs. May's antagonism to her brother's family and her plotting to prevent them from inheriting any*

*part of her mother's estate and to acquire all of it
for herself, her husband and her own children.*

It was testified that Mrs. May constantly talked
against Rose, her sister-in-law, saying to the testa-
trix on one occasion: "That damned Rose Frank has
spent enough or wasted enough of her (Mrs. May's)
dead daddy's money." Nurses testified that she tried
to prevent Rose from visiting the testatrix in the hos-
pitals where she was confined during the periods of
her illnesses,—efforts in that direction being made to
such an extent that the testatrix's physician had to
order that Rose be allowed to visit the testatrix if the
latter wanted her, which, the nurses said, she certainly
did.

And now we come to a damning bit of evidence
which shows not only Mrs. May's objective but the
reckless and even arrogant way in which she sought
to gain it. Mr. Crawford Conrad, investment officer
of the Mellon Bank, testified that Mrs. May visited
the bank on January 15, 1946, which (1) was but ten
days after Herbert's death, (2) was at least five days,
according to the Mays' testimony, before the testatrix
disclosed to them her wishes in regard to the disposi-
tion of her property, and (3) was the *very day on
which the testatrix was declaring to Mr. Ruslander
that she wanted to change her will so as to provide
better for her son's children than the one-third of the
estate she had provided in her previous wills.* Mr.
Conrad says that she stated she wished to discuss with
him how her mother could create some trusts *for her
(Mrs. May's) benefit and that of her children,* and she
said that *in her opinion Herbert's children should not
participate in her mother's estate.* It is true that she
denies having said these things to Mr. Conrad or that
that was her purpose in calling upon him, but he, of
course a perfectly disinterested witness, had made

notes of the interview and *the trial judge found that Mr. Conrad's statement was true.* Indeed, it may here be pointed out that Mrs. May not only contradicted Mr. Conrad but each and every one of all the numerous nurses, domestics and others who testified against her.

There are other incidents pointing strikingly in the same direction to show Mrs. May's undeviating determination to get her mother's money for herself and her family and prevent any of it being acquired by her brother's children. After she had succeeded in obtaining the power of attorney she made out checks, each for $3,000, to herself, to her husband, to her son, to her daughter, and to each of her daughter's two infant children. Shortly thereafter the testatrix herself made out checks, each for $3,000, to Herbert's children, Stephanie and Ann. The four checks which Mrs. May made out to herself, her husband and each of her children, were cashed, but she succeeded in having the two checks to Herbert's children held up on the ground, not justified by the fact, that there was not enough money in bank to meet them. Incidentally, Mrs. May's daughter attempted to cash the two checks to *her* children the very day after the testatrix died, concealing that fact from the bank. The testatrix, pathetically eager to make sure that Herbert's children would obtain the money covered by the two checks, wrote on one of the stubs: "Be sure to pay this and above check whether I am here or not. Mother." The stubs on one of which this inscription was written were found in a waste basket torn in pieces, under circumstances which clearly point to their having been destroyed by Mrs. May. It is of interest to note in this same connection that in the case of a check which the testatrix gave to her daughter-in-law with which to buy a car for Stephanie, the testatrix told her to cash it immediately before Florence (Mrs. May) found out about

it,—thus again showing a complete fear of her daughter.

(6) *Mr. May's conduct in connection with the drafting of the will.*

We have seen that on January 15, 1946, testatrix expressed to Mr. Ruslander her desire to provide for her son's children, impliedly to a larger extent than the one-third of her estate provided in her former wills for her son and after his death for his children. A very few days later—sometime between January 20 and 25th according to Mr. May's testimony—there occurred the visit of Mr. and Mrs. May to the testatrix at which it is clear, as will appear from her own subsequent declarations, that she was bullied into disinheriting these grandchildren. The interview was an extremely tumultuous one. Two witnesses testified that Mrs. May's voice was especially loud and harsh. The Mays state that the only subject for discussion was whether the testatrix should give half of her estate to Mrs. May and half to the latter's children, or two-thirds to Mrs. May and a third to her children. It would not seem that the decision of that question would require a long and acrimonious argument, since that was a relatively minor matter for the Mays themselves to decide and one as to which the testatrix would have had no particular feeling or interest, while Mrs. May testified that she herself did not care about it one way or the other. Why, then, was the discussion so heated? And why, as the witnesses testified did the testatrix come away from it agitated, depressed, and sobbing throughout the ensuing night?

There are two interesting matters to be noted in connection with this discussion. The one is that Mr. May originally testified that the agreement finally reached was that his wife was to obtain one-half of the estate and her children one-half, and yet the will

as drafted by him gave his wife two-thirds and her children one-third, so that it did not even conform with Mr. May's original version as to the outcome of the interview. The other interesting point is that Mr. May admits that the testatrix never *expressly* said she did not want Herbert's children to get anything, but that he merely *inferred* that from the fact that she said she wanted to change the one-third to Herbert and that the question was whether to make it half and half or one-third and two-thirds, Mr. May's *inference* being that this question related to a division, not between his family and Herbert's children, but between his wife and their own children. When we have in mind the testimony of Mr. Ruslander as to what the testatrix told him concerning her intentions in regard to her will, the loud shouting of Mrs. May in the discussion becomes readily understandable. It is no doubt true that the Mays were correct when they testified that the subject of the bitter discussion was the choice between a division of the estate half and half or two-thirds and one-third, but not, as they assert, as determining a division between Mrs. May and her children but between the May branch of the family and Herbert's branch, and it is no wonder that it took a prolonged time of shouting and intimidation of this sick and harassed woman to make her not only recede from her intention to increase the former share that would have come to Herbert's children but, on the contrary, take away from them entirely what in all her previous wills she had provided for her son and them.

It is true, as has already been conceded, that no outside witness was present at this family altercation between the testatrix and Mr. and Mrs. May to testify to exactly what transpired there. But, if such an auditory witness is indispensable in a case to prove

undue influence, such a witness could rarely if ever be produced, since witnesses are usually not only not invited but are carefully excluded on such occasions. It is from *all* the events that transpire and from *all* the testimony and circumstances that undue influence may, and in the present instance must, be inferred, not merely as a suspicion, but as a fact entirely clear if one is not to be unduly naive or credulous.

Mr. May, as has been previously stated, claims that one of the chief reasons why the testatrix disinherited Herbert's children was because she did not wish their mother to get any of her money, and yet he frankly admits that he did not advise her either as her son-in-law or as her lawyer, in which capacity he was then acting, that it was not necessary for her to disinherit them in order to prevent her daughter-in-law from profiting thereby. This is one of the most telling facts in this case. If the testatrix told Mr. May, as he claims that she did, that she did not want Rose to get any of her money and was therefore leaving all of it to the Mays, certainly any disinterested lawyer performing his duty would have immediately pointed out to her the very simple way in which she could have accomplished her desire without disinheriting these children. Mr. May is guilty of what must have been a deliberate concealment on his part of this obvious solution of any such problem, so that it clearly appears that, at best, the will here in controversy is not the will of an instructed Anna Frank, but of an Anna Frank grossly deceived by the intentional silence of her attorney trying to get her money for his own family. It has been repeatedly held, not only that a misrepresentation may be sufficient in itself to constitute undue influence that will void a will (*Phillips' Estate*, 244 Pa. 35, 43, 90 A. 457, 460; *Buhan v. Keslar*, 328 Pa. 312, 319, 194 A. 917, 920; *Olshefski's Es-*

tate, 337 Pa. 420, 424, 11 A. 2d 487, 489; *Wetzel v. Edwards,* 340 Pa. 121, 124, 16 A. 2d 441, 443; *Ash Will,* 351 Pa. 317, 322, 41 A. 2d 620, 622; *King Will,* 369 Pa. 523, 530, 87 A. 2d 469, 473; *Robert's Will,* 373 Pa. 7, 18, 94 A. 2d 780, 785) but that misrepresentations, in the eye of the law, are not confined merely to affirmative statements. "The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity": *Neuman v. Corn Exchange National Bank & Trust Co.,* 356 Pa. 442, 451, 51 A. 2d 759, 764. In Restatement, Torts, §529, comment a, it is said (and this is here particularly pertinent): "whether or not a partial disclosure of the facts is materially misleading depends upon whether the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in the transaction in hand." (See also §551). Acting as the testatrix's lawyer it was Mr. May's bounden duty to represent her without any consideration whatever of his own personal interest; he was frank enough to testify, when cross-examined as to why he did not tell the testatrix that it was possible to set up a testamentary trust so that her daughter-in-law could obtain no interest in it, that he was "naturally" interested in the May family!

In all the former wills that testatrix wrote she had employed other lawyers,—A. Leo Weil, William A. Wilson, or S. Leo Ruslander. Mr. May, as a lawyer conversant as he must or should have been with legal ethics, certainly knew (especially if the testatrix told him, as he claims, that she wished to leave all her estate to his wife and children and disinherit these other children who were equally the natural objects of her bounty) that he should not undertake to act as her professional adviser in the drafting of her will. Ob-

viously realizing this he tried to excuse himself by testifying that the testatrix told him she did not want anybody, any of her friends, to know about her personal business. What a pathetically weak excuse in view of the fact that not only, as previously stated, she had always employed other lawyers, but because, even at this very time, she discussed the question of her will with her very close and trusted friend, Mr. Ruslander! Mr. May, fully cognizant of the position in which he was placing himself and uneasy in regard to it, had continually in his mind the inevitable accusation of undue influence. It was because of that realization that he himself wrote into the testatrix's will the alleged lame and false reason why she was disinheriting her son's children and instead giving her entire estate to his own family. And it was also because of that realization that he resorted to the extremely clever maneuver which I shall now discuss, —a scheme to obtain in advance a respectable witness who might serve to give countenance to the contention that the testatrix had not been the victim of any undue influence exerted by him and his wife.

(7)  *The taking of the testatrix to Mr. Ittel's office.*

I think it fair to assert that were it not for the testimony of Mr. Ittel as to his interview with the testatrix, neither the court below nor this court would probably have entertained the slightest doubt but that this will was the result of the coercion and domination of the testatrix by her daughter and son-in-law. It is especially important, therefore, that we carefully analyze this episode in the drama which has here been enacted. It starts with a letter written by Mr. May to Mr. Beal of the law firm of Reed, Smith, Shaw and McClay. Mr. May makes no secret of the object he had in mind, for he testified that he "hoped that at

least a firm with the reputation of Reed, Smith, Shaw and McClay would have some standing and bearing in the courts of this county if anything did occur,"—in other words his purpose was to hide behind the skirts of respectability. The letter he wrote to Mr. Beal is remarkable both for its contents and its omissions. It did *not* ask the Reed, Smith, Shaw and McClay office to make any suggestions or corrections, legal or otherwise, in regard to the draft of the will which he was therewith submitting to them. It did *not* tell them anything about the condition, family or affairs of the testatrix or request them carefully to discuss with the testatrix, as her attorneys, her intentions in regard to the distribution of her estate. It merely made two remarkable requests. The one was that they should have a copy of the will which he was sending to them transcribed in their own office,—obviously so that the original would deceptively appear to have been drafted by them. The other was that they should delegate someone in their office to "consummate the matter" so that he would be in position to testify if the question of undue influence arose. He gave as his reason for having "the matter consummated" in their office his desire that no question be raised as to undue influence, of which he was always conscious and obviously and justifiably fearful.

Mr. Beal, in conformity with Mr. May's request, delegated Mr. Ittel to take care of the matter.

The taking of the testatrix to Mr. Ittel's office and her interview with him are paralleled only by the notorious Russian trials in which the defendant utters parrot-like admissions of guilt apparently sincere to those (by analogy in this case Mr. Ittel) who are wholly innocent and uninformed as to the coercion and pressure that had been exerted upon the victim before his formal appearance. The testatrix's faithful chauf-

feur having been dismissed for the day, it was Mr. May and his son who, without consulting her doctor or her nurse, took her to Mr. Ittel's office in their car. Never since her son's death had she left her apartment except attended by her nurse. Nurse and servants give us a graphic picture of the condition in which she was when taken away and of her attitude toward the coercive pressure that was being imposed upon her. Three such witnesses, all wholly disinterested, testified that she was extremely weak, that she had to be supported in order to walk, and that she was nervous, distraught and extremely upset. One of her nurses warned her that, in her opinion, she was not in a fit condition to go to town; she was nervous and crying and "really wasn't herself," but she insisted that she was going *because she had to go.* She told another of her nurses that Mr. May and his son were taking her to town, *that she did not want to go, but she had to go.* We shall see later what she said upon her return. She had to be supported by the May father and son on either side when they took her into Mr. Ittel's office. They waited in the corridor outside while the interview between Mr. Ittel and the testatrix took place. There are certain facts that must be borne in mind in connection with Mr. Ittel's testimony in regard to that interview. The first is that he was *not the testatrix's lawyer* nor employed as such. Indeed, why would the testatrix have wanted or needed Mr. Ittel or any other attorney? Mr. May had drafted her will and the only important change made from the wills drawn by her previous lawyers was to take away the legacy of the one-third of the estate from Herbert's children and transfer it to Mr. May's children. Why, then, as far as the *testatrix's* interest was concerned, would she have required an additional lawyer? The second point to be remembered is that Mr. Ittel knew nothing what-

ever about the testatrix, of her advanced age, of the strokes and illnesses she had suffered, of her distressed mental and emotional condition since the death of her son, of her family life, of the stormy interview between her and the Mays and of what transpired there, of Mrs. May's relations with her mother, or of any of the other facts and circumstances that an adequate interview would have disclosed if conducted by the client's *own* lawyer. But Mr. Ittel was not engaged by or for the testatrix in order to represent *her* interests but by and for Mr. May to represent *his* interest,—to be a witness for *him*. She made some statements to Mr. Ittel about her family, he read her the draft of the will and inquired whether that was what she wanted, and she said that it was. He, like Mr. May, made no attempt to inform her—to give her the all-important legal advice—that if she really did not want her daughter-in-law to share in her money, that purpose could be readily accomplished without any necessity whatever of disinheriting these grandchildren. To instance how loose and casual the conversation between them must have been, Mr. Ittel testified that he gleaned from what she told him that Herbert's children were each getting one-half million dollars from her husband's estate, which, of course, was absurdly untrue. The will having been signed and witnessed, Mr. May and his son entered and took her home. Mr. Ittel never had any illusion as to his not representing the testatrix and did not send her a bill for his services. He did not send Mr. May a bill because, as he stated, he knew it was a considerable estate and, "as all lawyers do," he felt he wanted to attract "that business" into the office. What I would emphasize is that, human nature being what it is, the testimony of Mr. Ittel, however conscientiously given, must be appraised as coming from an *interested* witness,—interested be-

cause of his having been employed by and for **Mr. May,**
interested because of his natural professional pride in
satisfactorily performing the duty for which he had
been engaged, interested because his office was en-
gaged in the trial of the case on behalf of the Mays.
Was the court below, and is this court, justified in
reversing the verdict of the jury when the only issue
involved was a purely factual one and this star wit-
ness for the Mays, like all their other witnesses, was
not a disinterested one, so that it is no wonder he did
not carry conviction with the jury as he undoubtedly
would and should have done had he been the *testa-
trix's* lawyer instead of *Mr. May's?*

When the testatrix returned from Mr. Ittel's office
she was crying and extremely agitated and depressed.
Why?

(8)  *The testatrix's own declarations.*

Certainly the person most competent to know
whether the testatrix was subjected to coercion, intimi-
dation and undue influence was the testatrix herself.
What did she herself say, and how can her own state-
ments be ignored as they are in the majority opin-
ion?

She told Mrs. Byrd, her maid, who was also her
daily companion and confidante, that she regretted
having made changes in her will and *wished* she could
make a new one; that she had done something she
*wished* she could do over, but that *Mrs. May would
not allow her to make another will; that she had been
forced by Mrs. May to change her will!* She cried as
she made this latter statement. She told Mrs. Tucker,
one of her nurses, that she regretted something she
had done and *wished* she could undo it but that *the
Mays would not let her.* One of her previous struggles
with her daughter was when the latter had practically

hammered her into giving her a power of attorney. She had told several of her nurses that if she gave Mrs. May a power of attorney she would not have a cent left, and when she was finally obliged to give in, she handed the executed instrument to Robinson, her chauffeur, saying, "Well, Dennis, here I go." And to Mrs. Carney, the friend who served her as a beautician, she said: "They will make me do what they want now." After the session with the Mays in the late January already described, Mrs. Tucker, her nurse, testified that she was crying and said to her, "You don't know what I go through." Is all this the language of one who has been *peacefully persuaded* by argument into making suggested provisions in her will? On the contrary, it is the voice of the testatrix herself, a voice now from the dead, saying to her intimates around her, not easily or lightly but with sobs and obvious mental distress, that she was dominated and bullied into doing things that she did not want to do. And she said the same thing in regard to the very will now in question.

A point is made by the proponents of the fact that the testatrix lived for fourteen months after the execution of the will and they therefore argue that she could, during that period, have changed it had she so desired. But apart from the fact that she suffered an ever increasing physical and mental deterioration in that last year of her life during which she was twice hospitalized, once in a comatose state, the real answer is, of course, that she remained all that time under the same continuous domination and constant surveillance of her daughter as before. The shackles once placed upon her could not thus be broken. She herself said that Mrs. May *would not allow her to make another will.*

(9) *Conclusion.*

Notwithstanding the foregoing lengthy recitals of testimony, there is much more, very much more, contained in the 2,000 pages of the record that could be cited in support of the contestants' cause. For instance I have not referred to the testimony in regard to Mrs. May's several attempts to induce the contestants' witnesses,—the testatrix's maid, chauffeur, and beautician—to testify on her side; Mrs. Carney, the beautician, stated that she said to her, "I will make it worth your while if you do." I merely allude also in passing to the fact that when Mrs. Gallinger, the aged sister of the testatrix, refused to testify for Mrs. May, Mr. May wrote her a harsh letter stating that they would no longer make her the monthly payments which they had been sending her in accordance with the express request of the testatrix that they should take care of their "Aunt Net and Aunt Bert." Here, too, as in the case of the tearing up of the stubs of the checks to Herbert's children, they were showing how much they cared about carrying out the solemn adjurations of their deceased mother. It is noteworthy that they were unable to procure a single worthwhile witness among the relatives, friends, maids, nurses, chauffeur, and other intimates of the testatrix, who would testify on their behalf, and would say that Mrs. May's relations with her mother and her conduct toward her and domination over her were other than as testified to by all the witnesses.

The cumulative effect of the testimony as a whole clearly indicates that Mrs. May had a feeling of extreme hostility to her sister-in-law, and partly because of that fact and partly because of her avaricious urge to obtain as much as possible for herself and her own children she succeeded in coercing her mother into making a will which was not only not in accordance with

the testatrix's wishes but even abhorrent to her real desires, in preventing her two nieces from each obtaining about $100,000 from their grandmother's estate, and in adding that $200,000 to the approximate $1,550,000 which her own children will ultimately acquire. And this, aided by her husband's failure to perform his professional duty, she accomplished, not by legitimate persuasion, but by intimidation, harshness, abuse, and terrorizing of her aged, ailing and distressed mother. To quote from the charge of the trial judge approved in the leading case of *Robinson v. Robinson,* 203 Pa. 400, 435, 53 A. 253, 265, "I repeat, so that there shall be no mistake about it—as we have said to you a son may importune his mother to make a will in his favor, and counsel for plaintiffs has repeated various forms of appeal, which you heard, that he may make to her, to induce her to make a will in his favor. That is true, he may do so, he has a perfect right to do it, and if the only effect was to move her affections or sense of duty, or judgment, he has a perfect right to do it. But if these importunities were such as the testator *hadn't the power to resist, and yielded for the sake of peace and quiet, or escaping from serious distress of mind, if they were carried to a degree by which the free play of testator's judgment, or discretion, or wishes were overcome, it is undue influence.* He can coax her, but he must not drive her, either by moral coercion or physical force." All the evidence in the present case plainly establishes that here the testatrix did not have the power to resist the importunities of these proponents of her alleged will. *Her mind was not persuaded but her will was overcome. That is exactly what the law calls undue influence.*

The most curious fact in this litigation is that, while the trial judge carefully and properly charged the

jury to have in mind the interest or the disinterestedness of the various witnesses in weighing their testimony, it is clear that the court itself did not have this same factor in mind in arriving at its decision. With the possible exception of the children's mother not a single one of those who testified for the contestants was an interested witness whereas every person who testified for the proponents as to any fact vital to the issue was very much interested. The jury, which obviously had this in mind, found that the will had been obtained by undue influence. In view of the *overwhelming* evidence supporting and indeed absolutely requiring that verdict, I do not see how the trial court's action setting it aside and entering judgment for the proponents can be accepted by our court as constituting a justified exercise of judicial discretion. I therefore respectfully dissent from the order of affirmance now being entered.

Mr. Justice JONES and Mr. Justice CHIDSEY concur in this dissenting opinion.

ORDER PER CURIAM, November 10, 1953:

A majority of the Court being of opinion that the costs of this litigation should be paid out of the corpus of the estate, the decree affirming the judgment is modified by adding thereto the words: "All costs to be paid out of the estate."