## Cozzens' Will.

1. Neither the register nor the Register's Court is bound to award an issue when demanded, in every case as to the validity and due execution of a will.

2. To entitle a party to an issue, there must be a dispute on some matter of fact material to the validity of the will.

3. A mere naked allegation without evidence or against evidence, cannot create a dispute requiring an issue.

4. The party requesting an issue must set forth the facts, that the court may be able to determine their materiality.

5. If the facts are material the court is bound to award an issue when requested, otherwise not.

6. A testator was paralyzed and said he was unable to write, he would put his mark to the will: he was raised in bed, a pen was put into his hand which was held by another whilst he made his mark. *Held,* that this was a valid execution of the will.

7. This was the testator's own act with the assistance of another, not the act of another under his authority.

February 25th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Register's Court of *Philadelphia:* No. 271, to January Term 1869.

On the 26th of November 1867 the will of George Cozzens, deceased, was admitted to probate by the register of Philadelphia. On the 28th of the same month a caveat was filed, and on the 4th of December letters testamentary were issued. On the 6th of December an appeal to the Register's Court from the decree of the register was taken on behalf of the Commonwealth, on the allegation that the decedent had died without heirs or known kindred, and that his estate had therefore escheated.

The will was dated October 21st 1867, and was made and executed by his mark at the Pennsylvania Hospital, where the testator was a patient. After giving legacies to several benevolent institutions, and $500 to G. W. Jones, the testator gave the residue of his estate to E. Adolph Rowland, whom he appointed executor.

[Cozzens' Will.]

The will was proved by the subscribing witnesses, Joseph McFadden and James Ballentine, who made the ordinary proof. McFadden, who was a nurse in the hospital, further testified that "Mr. Rowland read the will over to the testator, and asked him if that was his last will; he said it was, and it was all right. Mr. Rowland asked him to write his name, he said he did not feel able to do it, and said he would put his mark to it, and he did. I raised him up in bed, his hand shook so he said he could not sign his name. Mr. Rowland gave him the pen; the pen and ink were brought by Mr. Rowland from my room; he asked me for them. Mr. Rowland held the pen while he made his mark; that is all that occurred at that time that I remember. * * * His condition was at that time pretty low, he was prostrated a good bit on that day, he was a great deal better than on the day before. I think the condition of his mind was sound on that day; I judged so from questions I asked him. I asked him what he was going to do with his money; he said he was going to give some to benevolent institutions. I asked him had he no friends or relatives; he said he had no relative or friend but John Boyle, and he should have none of it."

Dr. Norris testified: "I am resident physician of hospital; I recollect Cozzens, he was admitted October 19th 1867, suffering from the result apparently of an old attack of apoplexy; he had some paralysis, I think, of left side; he had an inability physically to carry out the design; it is a disease of the brain, cerebellum. His brain was obtunded; his will may have been active enough, but was unable to show it by the action of the body; the chief symptom of the disease is inability to stand any time, would fall backwards. To a certain extent the reason is affected by the old disease apoplexy, but not by the disease of the cerebellum. I saw him twice or three times daily, from the 19th of October up to the time of his death. His mental condition did not vary much from what I have described; he had improved a little, and continued to do so up to the day of his death; he died of a sudden attack of apoplexy. I think on the 21st of October he was capable of making a will; I never saw anything the matter with his mental condition except the obtunded condition of the brain. I mean to say by that he gave evidence of no mental aberration, he did nothing that was out of the way at all. I think he was able on the day the will was executed to discriminate and exercise a sound judgment in disposing of his property. I think all along during his sickness he evinced great shrewdness. I think he was perfectly sound in mind, I conversed with him nearly every time I visited him; he always recognised me, held out his hand and talked very clearly, he did not rave or wander at all up to within an hour or two of his death."

[Cozzens' Will.]

R. C. Ridgway testified that the testator was anything but a sane man; if asked how he was, he would laugh; that the day after the execution of the will he was not capable of making a will or at any time for six months before entering the hospital. There was other evidence, some tending to show capacity and some incapacity. There was evidence also of a warm attachment of the testator to Rowland from his childhood, and also evidence of importunity on the part of Rowland on the day the will was executed, that the testator should make a will and of his refusing to do so. He died November 5th 1867. On the 3d of July 1868 the court (Allison, P. J. of the Common Pleas) made the following decree: "Appeal dismissed and issue refused."

On appeal to the Supreme Court the following errors were assigned: 1. Affirming the decree of the register refusing to award an issue. 2. Dismissing the appeal from the decision of the register. 3. In refusing the issue demanded by the appellant.

*P. Archer, Jr.*, and *B. H. Brewster*, Attorney-General, for appellant.—The Commonwealth had a right to be heard although no inquisition of escheat had been found. Had the Commonwealth proceeded by inquest she must first have shown that the decedent died intestate. As the probate is conclusive the Commonwealth should be heard: Spangler *v.* Rambler, 4 S. & R. 192; Asay *v.* Hoover, 5 Barr 35; Thompson *v.* Thompson, 9 Id. 234; Crawford *v.* Commonwealth, 1 Watts 485.

The decree of the Register's Court is conclusive after a year: Act of March 15th 1832, § 42, Pamph. L. 146, Purd. 862, pl. 24. The Commonwealth is trustee for five years after inquisition found for all persons establishing their claims: Act of September 29th 1787, § 6, 2 Sm. L. 428, Purd. 417, pl. 16. Where objections are made or a caveat entered, and no issue is directed by the register, he shall appoint a Register's Court at the request of a person interested; and the Register's Court shall, at the request of a party, direct an issue, &c.: Act of March 1832, §§ 25, 41, Pamph. L. 146, Purd. 861, pl. 21, 23. The issue was of right: Wikoff's Appeal, 3 Harris 289; Knight's Appeal, 7 Id. 494; 1 Sm. L., note 40. The execution was insufficient: Sticker *v.* Groves, 5 Whart. 386; Aurand *v.* Wilt, 9 Barr 54; Prickett's Will, 1 Phil. R. 306. As to undue influence and testamentary incapacity: 1 Jarman on Wills 37, 52, 79 and note; Dean *v.* Negley, 5 Wright 317; Eckert *v.* Flowry, 7 Id. 46; Breed *v.* Pratt, 18 Pick. 115; Clark *v.* Fisher, 1 Paige 171.

*G. W. Harkins* and *C. Gibbons*, for appellee.—The register is empowered, not required, to order an issue: Wikoff's Appeal, *supra*; Bradford's Will, 1 Pars. Eq. Cas. 153. The execution was sufficient: Act of January 27th 1848, § 1, Pamph. L. 16, Purd.

1017, pl. 7; Ruoff's Appeal, 2 Casey 219; Vanderniff *v.* Rinehart, 5 Id. 232; Vernon *v.* Kirk, 6 Id. 218. An understanding of the act is proof of testamentary capacity: Daniel *v.* Daniel, 3 Wright 191; Stevenson *v.* Stevenson, 9 Casey 469; McMasters *v.* Blair, 7 Id. 467.

The opinion of the court was delivered, May 11th 1869, by

WILLIAMS, J.—This is an appeal by the Commonwealth from the decree of the Register's Court of Philadelphia, dismissing the appeal from the decision of the register, admitting to probate the will of George Cozzens, deceased, and refusing an issue. The will bears date the 21st of October 1867, and was proved before the register by the subscribing witnesses on the 26th of November following. On the 28th, two days thereafter, a caveat was filed, and on the 4th of December letters testamentary were granted to the executor, and on the 6th an appeal was taken from the decision of the register to the Register's Court. An examiner was appointed to take testimony, and his report having been filed, the cause came on to be heard on the 3d of July 1868, when the appeal was dismissed and issue refused. From this decree an appeal was taken on the 29th of December 1868. We are not furnished with a copy of the caveat filed before the register, or even with its substance, and there is nothing in the docket entries, or in any other part of the record contained in the appellant's paper-book, showing that the register was requested to award an issue; nor does it appear that the Register's Court was asked to direct an issue for the trial of any facts touching the validity of the will in question, unless it may be inferred from the brief minute of the decree, "Appeal dismissed and issue refused." Neither the register nor Register's Court is bound to award an issue in every case touching the validity and due execution of a will when it is demanded. To entitle a party to an issue there must be a dispute upon some matter of fact material to the validity of the alleged will. A mere naked allegation without evidence or against evidence cannot create a dispute within the meaning of the law: Knight's Appeal, 7 Harris 494. It is, therefore, the duty of the party requesting an issue to set forth the facts in dispute, in order that the court may be able to determine their materiality. If the facts in dispute are material, the court is bound to award an issue when requested, otherwise not; the record does not show that the Register's Court was requested to direct an issue in this case; and if such a request can be inferred from the order of the court dismissing the appeal, we have no means of knowing or inferring what facts were alleged to be in dispute, and whether or not they were material to the validity of the will in controversy. In order to justify the court in reversing a decree of the Register's Court refusing an issue, it must be shown that there were material facts

[Cozzens' Will.]

in dispute, and that an issue was actually requested for the trial of these facts. It is not enough that the evidence taken before the Register's Court and sent up with the record, shows a conflict of testimony in regard to facts that may be material; for the Register's Court is not bound to grant an issue, unless expressly requested by a party in interest, but may determine the facts where there is a conflict of evidence, without the aid of a jury. If there was a request for an issue in this case, and if it was improperly refused by the Register's Court, we have not the means of correcting this error, inasmuch as the record does not show that any request by petition, motion, rule or other form of application, was made for an issue for the trial of any material fact or facts touching the validity or due execution of the will in question. This is a sufficient answer to the first and last assignments of error.

The 2d assignment, that the Register's Court erred in discharging the appeal from the decision of the register, may be readily answered. The testator was admitted as a patient in Pennsylvania Hospital two days before he made his will. He was suffering, as testified by the resident physician, from the result of an old attack of apoplexy, and had some paralysis of his left side, and an inability physically to carry out the design of his will. His brain was obtunded; his will may have been active enough, but was unable to show it by the action of the body. The chief symptom of the disease, is an inability to stand any time without falling backwards. The attending physician and nurses who had the best opportunity and means of knowing his mental condition at the time the will was made, all testify that he was of sound mind and capable of making his will. Dr. Norris, who saw him twice or three times daily from the 19th of October up to the time of his death, on the 25th of November 1867, says: "I think, on the 21st of October, he was capable of making a will. I never saw anything the matter with his mental condition, except the obtunded condition of his brain. I mean to say by that, he gave no evidence of mental aberration. He did nothing that was out of the way at all. I think he was able on the day the will was executed, to discriminate and exercise a sound judgment in disposing of his property. I think, all along during his sickness, he evinced great shrewdness. I think he was perfectly sound in mind. I conversed with him nearly every time I visited him; he always recognised me, held out his hand, and talked very clearly." McFadden, the nurse, who was one of the subscribing witnesses to the will, says: "I think the condition of his mind was sound on that day. I judge so from questions I asked him. I asked him what he was going to do with his money. He said he was going to give some to benevolent institutions. I asked him had he no friends or relatives. He said he had no relative or friend but

[Cozzens' Will.]

John Boyle, and he should have none of it." It is true, there is some conflicting evidence as to the mental condition of the testator, but the weight of the evidence is strongly in favor of his testamentary capacity, and that no undue influence was exercised over him by the executor, or any one else, in order to induce him to dispose of his property by will in the manner he did. And the evidence shows that it was properly executed. It was read over to him in the presence of the subscribing witnesses, and he was asked if it was his last will? He said it was, and it was all right. According to the testimony of McFadden, "Mr. Rowland asked him to write his name. He said he did not feel able to do it, and he would put his mark to it; and he did. I raised him up in bed; his hand shook so he said he could not sign his name. Mr. Rowland gave him the pen. The pen and ink were brought by Mr. Rowland from my room. He asked me for them. Mr. Rowland held the pen while he made his mark." That this was a good and valid execution of the will is clearly shown by the case of Vandruff v. Rinehart, 5 Casey 232. It was there held, that if one having testamentary capacity is unable from palsy or other cause, to make his signature or mark to his will, another person may steady his hand and aid him in so doing; and it is not necessary to prove an express request from the testator for such assistance. The act is his own with the assistance of another, and not the act of another under authority from him. Upon a careful review of the whole record we are clearly of the opinion that the Register's Court was right in finding that the testator was of sound and disposing mind at the time he made his will, and that he executed it in proper legal form, and without any undue influence, and for these reasons there was no error in dismissing the appeal. This view renders it unnecessary to decide the question raised by the appellee whether the Commonwealth, claiming the estate of the decedent as an escheat, has a legal right to be heard in the case until inquisition of escheat found under the Acts of 1787 and 1821. If the Commonwealth may intervene to contest the validity of the will of one dying without heirs or any known kindred, at the instance of a deputy escheator appointed by the auditor-general for this purpose, it may admit of very grave doubt, whether a mere informer or private person has a right to use the name of the Commonwealth for the purpose of contesting the will of one so dying, or appealing from the decision of the register admitting it to probate. But it is unnecessary to decide this question, as the appeal must be dismissed for the reasons already given.

Appeal dismissed and decree of Register's Court affirmed, at the cost of the appellant.