Obici et al., Appellants, *v.* Third National Bank & Trust Company of Scranton.

Argued January 13, 1955.    Before STERN, C. J.,
STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Mitchell Jenkins,* with him *Maurice V. Cummings*
and *Nicholas R. Degillio,* for appellants.

*Matthew D. Mackie,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March
14, 1955:
The sole issue raised by this appeal is whether or
not the signatures of the settlor on the purported
Amendment to an *inter vivos* deed of trust were for-

geries. The learned Chancellor who heard the testimony found that the signatures were genuine. He dismissed the complaint in equity which sought to set aside the document.

On January 13, 1945, Amedeo Obici erected two *inter vivos* trusts, one known as the "Friends and Relatives Trust" and the other named the "Charitable Trust". The Third National Bank of Scranton, Pa., was the corporate trustee in both trusts. The individual co-trustees are Frank A. English, Ralph J. Lisman, Joseph Rocereto and C. H. Murden who are successors to Mario Peruzzi, the originally named co-trustee, after his death. The trustees are named as defendants. A brother, Frank A. Obici, and his children are the plaintiffs.

Under the terms of the "Friends and Relatives Trust" 1785 shares of the corporate stock of the Planters Nut & Chocolate Company were placed in trust. The settlor, Amedeo Obici, was to receive the income therefrom for life and upon his decease such income was to be distributed as set forth in a schedule attached to the deed. Among the named beneficiaries were the plaintiffs, with their respective interests specified. On or about April 19, 1946, the settlor executed an Amendment to the trust together with other documents whereby 650 shares of the 1785 shares of the corporate stock trust res were transferred from the "Friends and Relatives Trust" to the "Charitable Trust". The effect of such Amendment was to eliminate from the trust the named plaintiffs as beneficiaries upon the death of settlor. The settlor died May 21, 1947.

The Chancellor found that Alonzo M. McNickle, described as a specialist in estate planning, had been employed by settlor to assist him and his counsel, Matthew D. Mackie, Esq., in planning the distribution

of settlor's vast estate. Mr. McNickle would receive instructions from settlor, whereupon Mr. McNickle would transmit the information to settlor's counsel, Mr. Mackie, who in turn would prepare the necessary papers for execution and transmit them to Mr. McNickle, who supervised their execution by settlor.

The Chancellor found that on or about April 15, 1946, Mr. McNickle was called to settlor's home at Suffolk, Virginia, by the settlor, and was requested by him to prepare changes in the "Friends and Relatives Trust", removing plaintiffs as beneficiaries and transfer such shares to the "Charitable Trust". Settlor also directed that his will be changed, bequeathing $1,000 to each of the plaintiffs. On April 18, 1946, Mr. McNickle went to Scranton to Mr. Mackie's office and had him prepare the papers. On April 19, Mr. McNickle took the documents to settlor at the home of Mario Peruzzi, in Wilkes-Barre, where settlor executed them in the presence of Mr. McNickle. No one signed as an attesting witness. According to Mr. McNickle's testimony, accepted as credible by the Chancellor, the *will* was dated April 20, 1946. The reason assigned by Mr. McNickle for the difference in dates of the questioned trust Amendment and the will was that April 19, 1946 was Good Friday and also because Mr. McNickle desired to have the changes in the trust agreement antedate the will "so that there would be no legal question as to the incorporation by reference in the will of the terms of the existing trust".

Appellants charge that settlor's name on the trust Amendment is forged. To overcome the force of Mr. McNickle's testimony that he saw settlor affix his signature to the paper, appellants point to many matters which they regard as suspicious. Furthermore, they produced a handwriting expert and several lay witnesses who testified that, in their opinions, the signa-

tures of settlor were forged. Defendants also produced a handwriting expert and lay witnesses who testified that the signatures of settlor were genuine. The Chancellor found as a fact that settlor did execute the documents in his own handwriting. He accepted as credible the testimony of defendants' witnesses.

Amedeo Obici's signature appears twice on the Amendment, once as settlor and again as individual trustee. Two officials of the corporate trustee also affixed their signatures along with that of Mr. Obici. The Obici signature again appears twice on the letter to the corporate trustee authorizing the transfer of the 650 shares of stock from the "Friends and Relatives Trust" to the "Charitable Trust". One of these two signatures is likewise written in the capacity of individual trustee.

This Court has held that the credibility of witnesses is a matter resting with the finders of fact. In *Garrett Estate*, 372 Pa. 438, 447, 94 A. 2d 357, we said: " '. . . Credibility of witnesses is always for the finders of fact: Nanty-Glo Boro. v. Amer. Surety Co., 309 Pa. 236, 163 A. 523. The disbelief of witnesses by a chancellor or . . . auditing judge which is approved by the court en banc, is conclusive on the appellate courts in the absence of proof of bias, prejudice, prejudgment, or capricious disbelief: Roberts Estate, 350 Pa. 467, 39 A. 2d 592; Osterling's Estate, 323 Pa. 23, 185 A. 790; Pusey's Estate, 321 Pa. 248, 184 A. 844'; Archer Estate, 363 Pa. 534, 70 A. 2d 857."

Unlike the situation in *Young Estate*, 347 Pa. 457, 32 A. 2d 901, the Chancellor in the present case believed the testimony of Mr. McNickle *who testified that he saw settlor affix his signatures to the documents*. This overcame any *opinion evidence* of expert and lay witnesses. In *Pochron Will*, 367 Pa. 306, 311, 80 A. 2d 794, we said: "The philosophy of the doctrine

that opinion testimony alone will not overthrow testimony of actual fact is well expressed by Mr. Chief Justice DREW in Ray, to use, v. Philadelphia, 344 Pa. 439, 441, 442, 25 A. 2d 145: 'An opinion is only that; it creates no fact. It is what someone thinks about something, and the thought may be precisely accurate or totally inaccurate, and yet represent the absolutely honest conviction of the person who expresses it. Because of this, opinion evidence is generally considered of a low grade, and not entitled to much weight against positive testimony of actual facts. There is a great difference between factual and opinion testimony. In the one the witness testifies to the fact and certifies that what he says of it is true. In the other, he only testifies to his opinion that such a thing is true, and certifies only to his integrity of belief. He says he believes his opinion to be correct, but he does not warrant it to be true, and does not pretend that he cannot be mistaken.'

"As the *opinion* evidence of contestants, standing alone, does not overcome the factual and unimpeached testimony of the three attesting witnesses (also supported by opinion evidence), proof of the forgery of testatrix's signature to the questioned writing has not been established."

In accepting as credible defendants' evidence and rejecting that of plaintiffs', the learned Chancellor states: "The signature of Amedeo Obici purported to be made on the amendment to the 'Friends and Relatives Trust' of April 19, 1946, is challenged as a forgery. In order to find such a fact the Chancellor would have to hold (1) that McNickle is a liar; (2) that McNickle is a forger, or (3) that Mackie, Attorney, is a forger, . . .

"The Chancellor can find no warrant in the evidence to make any such finding. To make such a find-

ing would be to assume the existence of the most fantastic, improbable and senseless plot imaginable. . . ."

This Court has repeatedly held that suspicion and conjecture do not take the place of evidence: *Rosenthal's Estate*, 339 Pa. 488, 496, 15 A. 2d 370; *William Sellers & Co., Inc. v. Clarke-Harrison, Inc.*, 354 Pa. 109, 46 A. 2d 497; *Lasky v. Paprocki*, 363 Pa. 50, 68 A. 2d 593; *Pochron Will*, 367 Pa. 306, 80 A. 2d 794.

The decree is affirmed. Costs to be paid by appellants.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

As the little acorn can rear a mighty oak, the lowly peanut in this case created a commercial empire of plantations, factories, offices, warehouses and stores. Its guiding genius was Amedeo Obici who arrived in this opportunity-blessed land of America from Italy *circa* 1888 and died in 1947.

On January 13, 1945, Amedeo Obici created a "Friends and Relatives" trust whereby his brother Frank A. Obici with Frank's children were to enjoy a substantial part of Amedeo's estate upon his death. After his death, there came to light a paper known as an Amendment to the trust (reputedly signed April 19, 1945) wherein all benefits theretofore payable to Frank Obici and his children were wiped out. Frank Obici and his children protested this Amendment, claimed that it was a forged document and filed a Complaint in Equity seeking to restore unimpaired the original provisions of the Trust of January 13, 1945.

The learned Chancellor in the Court below dismissed the Complaint and said that he could not declare the Amendment to the Trust a fraudulent paper because to make such a finding "would be to assume

the existence of the most fantastic, improbable and senseless plot imaginable." Such a plot could well be immoral and illegal but it could hardly be characterized as "senseless." The estate left by Amedeo Obici amounted to six million dollars! There have been fabulous plots and fantastic scheming for sums less than that handy treasure chest.

The learned Chancellor found it difficult to believe that Amedeo Obici would not disinherit his only brother with whom he had been associated for forty years in the building of the fortune which is the subject of this lawsuit. As I read the testimony I find it more than difficult to believe that he would. The record reveals that Amedeo Obici was a man of sturdy character, straightforward in his dealings, devoted to his brother with strong bonds of affection and family love, and generous to him and his family. This warmth of feeling for them was evident throughout the lives of all the plaintiffs and continued unabatedly even after the date on which he supposedly struck them from the sphere of his munificent bounty. It is almost impossible to believe that a brother who had been so good to his blood kin could wear a cloak of unmitigated hypocrisy to be removed only when the shrouds of death took its place.

Amedeo showed a particular fondness for Susan Obici, daughter of his brother Frank. He always greeted her affectionately and with a kiss. He lavished gifts on her (among others a diamond necklace), and at the time of her wedding he paid for the wedding celebration which took place in his home. When confined to the hospital at the birth of her child, he sent her flowers. (This after the purported Amendment.) When the child was to be christened, Susan postponed the christening date because of the following letter she received from Mr. Obici who was at the time in Cali-

fornia: "Please wait because it not only will be an honor but . . . it will make me very happy if you waited until I return from California. Why? Because I christened you when you were a little baby, I stood up at your wedding, and now I want the honor to christen your baby." It could only be a person of the most brutal instincts (which no one ever ascribed to Amedeo) who could stand up by his grandniece at her baptism while planning to exclude her from the sunshine of the tremendous wealth which he could not take with him. There is absolutely nothing in the record which would rationalize Amedeo's repulsion of Susan and her baby to whom he was devoted in every way that one can show affectionate devotion. Up to the date of his death he continued to speak of his intention to take care of Susan. She testified: "Well, one day he looked very good, and I said, 'Uncle, you look wonderful today. I'm so happy.' 'Yes,' he says, 'that's what you think, but your uncle is going to die,' and then he turned to me, 'Don't you worry, don't forget what I told you in 1944.' He said, 'You are well taken care of, you and your family. You will never have to worry when my eyes are closed.' "

But, according to the defendants, Amedeo was scheming to disinherit Susan and her baby while his eyes were still open. In the absence of evidence that Amedeo completely lost his senses, there is a certain evidentiary obligation on the part of the defendants to show how and why Amedeo could do something so diametrically opposed to what is natural and normal. If Amedeo had any reason to disinherit his blood relatives he also had the character to tell them that reason. Why would he wait to inflict a sardonic revenge in the tomb?

The learned Chancellor offers the explanation that Amedeo became angry because Joseph, his nephew, had

decided to open a peanut store in Wilkes-Barre. That the owner of a six million dollar peanut business would be angry because the son of his brother would sell a few peanuts is to me inconceivable. And that this wrath could reach such monumental proportions that Amedeo would, because of it, disinherit not only Joseph, but Joseph's sister and brothers and his own brother as well, is so bizarre and fantastic an idea that it can find lodgment only in the misty land of uninhibited imagination.

Constancy of character, short of mental derangement, is as objective a reality as a snow-capped mountain. The noxious tree of inhumanity does not bring forth poison apples overnight. To make believable the idea that Amedeo could proffer such poisoned fruit, there must be some evidence of the seed of malevolence, misanthropy and deceit, none of which, it is conceded, was sown in the life of Amedeo Obici.

This Court has frequently said that a Chancellor's findings will not be reversed if they appear to be supported by evidence. However, we have also said that the appellate courts may "draw their own inferences and make their own deductions and conclusions "from that evidence." * Applying that rule to the instant situation, it is my conviction that it is more logical to conclude that Amedeo Obici did not disinherit his flesh and blood because of a supposed affront over the opening of a new peanut stand than that he did disinherit him for that reason. I would draw the inference, based upon the granitic foundation that Amedeo Obici was a reasoning and honest man, that he would not strike down the son of his own father and mother with whom he had never quarreled as he stood on the brink of eternity where he was to meet that same father and

---

* *Peters v. Machikas*, 378 Pa. 52, 56.

mother. Odd and peculiar as at times seem the ways of the world, irrationalization has not so seized the human race that rivulets of anger control glaciers of thought and flea bites destroy intellect. At any rate, we should not found decisions on what is extremely improbable when the proved possible is ours to build on.

The plaintiffs called as an expert handwriting witness a J. Howard Haring who, with 25 years experience in studying questioned documents, examined the signature which appeared on the purported Amendment, compared it with admittedly genuine signatures of Amedeo Obici and pronounced the former signature a forgery. The defendants called an expert handwriting witness of their own and he declared the disputed signature to be authentic. Several lay witnesses stated they believed the controverted signature to be bona fide and several more testified that it was counterfeit.

The defendants called to the witness stand Alonzo M. McNickle who at the time of the transaction in litigation was assistant trust officer of the Third National Bank & Trust Company of Scranton, one of the defendants in the case. He testified that he visited Amedeo Obici on April 19, 1946 and submitted to him the Amendment which had been prepared by Matthew D. Mackie, attorney for the defendants, and that he saw Amedeo sign the Amendment. If Mr. McNickle's testimony is to be believed, the Chancellor was justified in dismissing the plaintiffs' claim. But is he to be believed?

No witness attested in writing to the signature of Amedeo Obici. Why? According to McNickle he was present when Amedeo signed the document. Why didn't McNickle sign the document as a witness? McNickle testified he told Amedeo that he expected trouble to

follow when Obici signed the Amendment. If he anticipated trouble why did he not call people who were available to witness the signature and sign as having witnessed it? This obvious question was not answered by the Court below, nor has it been answered by the Majority here. The Chancellor's decision to accept the Amendment as a genuine document must stand on McNickle's testimony alone. I repeat: Is he to be believed?

In *Young Estate,* 347 Pa. 457, 459, we said: "Other jurisdictions are in accord with the Pennsylvania rule as to the testimony of handwriting experts *plus circumstances of probative value being sufficient to overcome the testimony of those claiming to be subscribing witnesses* to a questioned document."* The facts in the case at bar are stronger than those in the *Young* case because here there were no subscribing witnesses. In the *Young* case we quoted from Wigmore on Evidence as follows: "Wigmore on Evidence, 3d Ed. Vol. IV, sec. 1302 (clause 3), says: 'The testimony of the attesting witnesses is of course *not conclusive in favor* of execution even when all agree and when no personal impeachment is attempted . . . The unanimous testimony of the attesters may fail of credit even though the only opposing evidence is that of the alleged maker's handwriting as analyzed by expert witnesses. *The circumstantial evidence afforded by the handwriting may in a given case be more convincing than the testimony of the attesters . . . .'* "

In the case of *Dworken v. McElwee,* 355 Pa. 37, we affirmed a verdict where the testimony of one handwriting expert was corroborated by lay witnesses who declared the disputed signature there a forgery. We said: "Here, the opinion of the handwriting expert is

* Italics throughout, mine.

corroborated by the testimony of Mrs. Nunley, and, as in *Young Estate,* supra, *there are, in addition to the opinion evidence, other circumstances* which might have been considered by the jury in arriving at their verdict." This Court then enumerated various logical reasons as to why it was improbable that the reputed signer would have signed the note in question, just as here I have indicated why it is opposed to all norms of family relationship for Amedeo Obici to have evicted his brother from the temple of an established benevolent fraternal love.

Against finding for the plaintiffs the learned Chancellor in the Court below erected imaginable barriers over which he then refused to carry the inevitable logic of the situation. He said: "In order to find such a fact [the forgery] the Chancellor would have to hold (1) that McNickle is a liar; (2) that McNickle is a forger, or (3) that Mackie, Attorney, is a forger." The Chancellor was not required to make any such finding. It was not incumbent upon him to announce who *was* the forger. It was sufficient for him to find, as we think the plaintiffs conclusively established,—under all the circumstances, plus the expert testimony of Haring,—that Amedeo Obici did not and could not have signed the revocation in question.

So far as the rights of the plaintiffs were concerned, McNickle's testimony was catastrophic. Therefore, it was absolutely necessary for his testimony to have been subjected to the severest tests of credibility. This witness testified that although the Amendment was actually signed on April 19th he dated it April 20th so that it would not conflict with a will which was dated April 20th. He admitted under cross examination that what he did in this regard was "untrue and incorrect":
"Q. And you were afraid that if the trust arrangement or if one of the documents didn't show a different date

from the other, that is the will showed a different date than the trust agreement, that there might be some question of the legality of the Plaintiffs' Exhibit No. 74, the modification of the trust agreement, is that correct? A. That's right. Q. So that you suggested and had your client put upon that instrument a different date than the one upon which it was actually executed in order to avoid a possible legal entanglement; isn't that right? A. That's right. Q. And in so doing *you knew you were doing something which was untrue and incorrect, did you not? A. That's right.*"

Attorney Mackie received $125,000 for handling the proceedings of the estate. He turned over 10% of this amount, $12,500, to McNickle. Why? The fee incidentally was not paid by check, the normal vehicle for transfer of funds, but by bearer bonds not easily traceable. When asked on the witness stand for whom he had performed his services, McNickle testified that he was paid as an agent of the executors. But he was not paid by the executors, nor does his fee appear on the executors' account.

This case can be decided for the defendants only on the supposition that Mr. McNickle's testimony is absolutely and trustworthily reliable. The Chancellor regarded McNickle as the upper turret of the tower of evidence, but who supported the turret? The Chancellor says that the defendant's expert witnesses supported McNickle. But who supported the expert witnesses? The Chancellor says McNickle. Strange as this sounds, here are the Chancellor's words: "The credibility of McNickle as a witness was bolstered up by the testimony of the expert and other opinion witnesses and in turn the credibility of their testimony was supported by the direct evidence of McNickle." Thus we have McNickle as the strong man in the act holding up the expert witnesses and they in turn holding up Mc-

Nickle! This makes McNickle not only a Samson of strength but a contortionist as well. There should be little difficulty in believing, after reading his extraordinary testimony, that the latter is true.

Is it fair and equitable to disinherit a whole family on such slippery and contorted testimony?

My answer is in the negative, wherefore I dissent.