## Milleman Estate

*James C. Tallant* and *Elizabeth Bailey*, for appellant.

*McMonigle & Vesely*, for respondent.

BOYLE, P. J., May 14, 1963.—This will contest involves an appeal from the decree of the register of wills entered January 16, 1962, admitting to probate a paper writing dated January 6, 1962, as the last will and testament of the above named decedent.

The questions involved are the following:

1. Whether the will ". . . was signed by the testator at the end thereof . . ." as required by the first paragraph of section 2 of the Wills Act of 1947, when the testator's signature was written with the assistance of another person.

2. Whether decedent possessed testamentary capacity at the time of the signing of the will.

3. Whether the will was procured by undue influence, duress and constraint practiced upon decedent by Marie R. Frank, a beneficiary.

At the beginning of the hearing the parties stipulated as follows:

"It is stipulated and agreed between counsel for the contestants and counsel for the proponents that in the event the Court determine that an issue devisavit vel non shall be awarded, the said issue shall be determined forthwith by the hearing judge, without a jury, sitting as Chancellor.

"It is further stipulated and agreed that the parties shall be bound by the determination of the Chancellor, reserving the right of exception and appeal."

Decedent, William P. Milleman, Jr., late of the City of Pittsburgh, Allegheny County, Pa., was born on November 21, 1909, and died on January 10, 1962, unmarried and without issue. His parents and grandparents predeceased him and he left no brothers or

sisters. His only heirs at law are two aunts and several first cousins.

Appellants who are contesting the will are a cousin, R. E. Milleman of Pittsburgh, and an aunt, Mrs. Jeannetta F. Brown of Mars, Butler County, Pa. Mrs. Brown is a beneficiary under the will. R. E. Milleman is not a beneficiary.

For many years prior to his death, testator suffered from the disease of multiple sclerosis. About 1955, he became paralyzed from the waist down and was bedfast from that year until the day of his death in 1962. The paralysis involved his hands to the extent that on January 6, 1962, the date of the signing of the will, and for several years prior thereto he could not hold a pen in his fingers, nor use a knife, fork or spoon. Dr. Wirts, his physician who attended and treated decedent during the last years of his life (1955-1962), and who attended him professionally on the morning of January 6, 1962, testified that decedent shook hands with him on that day. Other witnesses testified that decedent, who was accustomed to shake hands with visitors, had a firm grip. There is testimony that he had sufficient muscle power in his hands to hold the telephone which he used frequently; that he could hold a sandwich and eat it without assistance on occasion. His principal difficulty was in holding small objects. The testimony is clear that decedent, although a literate person who had learned to read and write in his youth, was unable to write or sign his name without assistance during the last years of his life. Decedent had been in St. John's Hospital for treatment in 1955. After his release therefrom he was bedfast at home and was cared for by two practical nurses, one of whom, Marie R. Frank, served him for seven years, and Blanche Wilk who served him for five years, until his death.

Ira C. Houck, Jr., Esq., a lawyer of high standing

at the bar, discussed with decedent on January 3, 1962, the changes which decedent wished to make in his will of 1958, which had been prepared by Mr. Houck, Jr.'s father. Mr. Houck, Jr. is the scrivener of the challenged will dated January 6, 1962.

On the morning of January 6, 1962, the day the will was executed, Dr. Wirts made one of his regular professional visits to decedent and gave him a general check-up. Decedent was awake and greeted the doctor, shook hands and had a general conversation with him. Decedent greeted the doctor by saying, "Hiah Doctor," raising his right hand in a wave as the doctor entered the room. Decedent shook hands with a firm grip and, during the 10 or 15-minute visit of the doctor, decedent's conversation was normal. His mental condition at the time was quite lucid according to Dr. Wirts. Decedent suffered no pain. At the time of the doctor's visit there was sufficient motive power in the muscles of the right arm and hand of decedent, in the opinion of the doctor, to have subscribed his name on paper with the assistance of another.

The will was executed at approximately 2 p.m. on January 6, 1962. It was signed by decedent with assistance rendered by Mrs. Marie R. Frank in the presence of Ira C. Houck, Jr., Esq. and a Mr. John Hunter, Jr. who are the subscribing witnesses. According to the testimony of Mr. Houck, Jr., called as a witness by the contestants, the will was signed by decedent in the same manner that checks, income tax returns and other writings had been signed by him in the past, that is, with the assistance of Mrs. Frank, who produced a writing surface and placed it upon the legs of the testator which were propped up before him as a base for the writing surface. Then a pen was given to Mr. Milleman and he held it in his hand. Mr. Houck, Jr. demonstrated in response to questioning by the court how the pen was held by testator, with the right hand

of Mrs. Frank superimposed over the right hand of testator, to apply sufficient pressure for guidance and proper grasp. The will was signed by decedent in this manner after the will had been read aloud to him in its entirety by Mr. Houck, Jr., and after decedent had indicated his assent to the provisions thereof by saying "Yes" and nodding his head as each paragraph was read and after decedent was asked if he desired to sign it. The will was then signed by the subscribing witnesses in the presence of decedent and each other.

Mr. Hunter, the other subscribing witness who was present at the signing of the will on January 6, 1962, testified in part, official notes of testimony, pp. 266-8:

"Q. Was Mr. Milleman awake at that time?

"A. Yes. Mr. Milleman, I gathered from his appearance, had just finished lunch. Mrs. Frank was removing his bib from him.

"Q. What happened then?

"A. I was introduced to Mr. Milleman. We shook hands; we talked a little about the weather, and Mr. Houck then informed him that he had brought his will with him and was going to read it to him.

"Q. What happened then?

"A. Mr. Houck handed me a copy of the will, and I believe one to Mrs. Frank, and kept one, and I read it along with him, quietly of course, to myself as he read it to Mr. Milleman.

"Q. You mean he read it aloud?

"A. Yes.

"Q. Was Mr. Milleman awake then?

"A. Oh, yes. In fact during the reading of the will Mr. Milleman stopped him at one point and asked him to repeat something. I don't remember what it pertained to other than the fact that it was something about some stock, and Mr. Houck reread that particular paragraph to him. He said 'That is fine,' and then he went on and finished reading it to him.

"Q. When you say he said, 'That is fine.'

"A. Mr. Milleman said, 'That is fine,' and Mr. Houck continued reading the will.

"Q. At the conclusion of the reading of the will by Mr. Houck to Mr. Milleman, what happened.?

"A. Mr. Houck asked him if everything was all right and Mr. Milleman said it was, and Mr. Houck asked Mr. Milleman to sign the will.

"Q. Can you tell us how that was accomplished?

"A. Mr. Milleman of course was lying in bed. He was cranked up when we got in there. He had finished lunch. She put something on his lap, I don't remember what, masonite or cardboard or something, and helped him, supported his hand while he signed the will and dated it and initialed each page. Then Mr. Houck signed the will as a witness, and then I signed it.

"Q. How long thereafter did you remain?

"A. I would say probably 10 minutes, maybe even 15. Mr. Houck has spoken to me about Mr. Milleman at one time, and I was quite impressed with Mr. Milleman.

"Q. Was Mr. Milleman conversant during this entire time?

"A. Yes.

"Q. How long were you in the room altogether would you say?

"A. Approximately an hour, maybe a little less, maybe a little more.

"Q. Did you shake hands when you left?

"A. Yes, we did. Mr. Milleman thanked me for coming over.

"Q. Can you describe how this assistance was granted to Mr. Milleman in connection with his signing of the will?

"A. Yes. Mrs. Frank placed her hand over the top of Mr. Milleman's hand.

"Q. Was there any objection by Mr. Milleman?

"A. No.

"Q. Go on.

"A. First they put on the date and initialed each page, and Mr. Milleman's signature on the last page."

The testimony of Dr. Wirts, who was decedent's physician during the last seven years of his life and who attended decedent on the morning of January 6, 1962, the day on which the will was signed, is to the effect that decedent not only possessed the muscular power to raise his arm and to shake hands on January 6, 1962, but that he also possessed sufficient muscular power in his hand and arm to write his signature with assistance. Part of Dr. Wirt's testimony as to testator's condition and as to his physical ability to sign his name with assistance on the day of the execution of the will is the following, official notes of testimony, pp. 242-4:

"Q. Can you tell us anything with respect to your initial contact with Mr. Milleman that morning when you entered the room?

"A. Oh, just—of course I always took the liberty of just walking in, and he had a glass door, you could always see anybody approaching; and his usual greeting was, 'Hiah, Doctor,' and then mine, 'How are you today, Bill? How have you been?'

"Q. When you testified that he said 'Hiah, Doctor,' you raised the right hand. Was that indicative of the manner in which you were greeted by Mr. Milleman?

"A. Always.

"Q. Was he able then to move his hand?

"A. Oh, we always shook hands.

"Q. You did shake hands on that morning, did you?

"A. Every morning.

"Q. Did Mr. Milleman then have a grip?

"A. Yes, he had a grip.

"Q. You testified you had a short conversation with

Mr. Milleman about things in general; is that right?

"A. That's right.

"Q. What else did you do?

"A. Well, as I said, we checked his blood pressure, checked his urine; and then I conversed with the nurse —I think Mrs. Frank was on that morning,—as to how he had been, because we had a little trouble with his appetite then; so we just talked generally.

"Q. About how long would you say you remained with your patient?

"A. It wasn't over 10 or 15 minutes.

"Q. During that time was your patient fully awake?

"A. Yes, he was.

"Q. Doctor, you have testified you have known Bill Milleman a long time; you were in personal attendance with the patient on Saturday, January 6, 1962, at which time you apparently examined him. Are you able to give us any opinion as to his mental ability to recognize the objects of his bounty and the extent and nature of his property?

"A. Well, of course we knew Bill was sick and that he was declining; but truthfully the 10 or 12 minutes or 15 I was there, our conversation was just like you and I would be talking now.

"Q. Do I understand then that you can make a determination as to whether he had sufficient mental capacity to understand the transaction of natural, ordinary, everyday affairs?

"A. I think he was able to recognize me and answer my questions, 'How are you, Bill?—How did you rest?' And so on. Yes.

"Q. Can you then state what your opinion is with regard to his mental capacity. Was it good or was it bad?

"A. I would say at that time when I saw him he was quite lucid.

"Q. When you say he was quite lucid; then you indicate that he recognized—he would have the ability to recognize people, be conscious of his own affairs, and recognize persons who might be the natural objects of his bounty; is that right?

"A. Well, he knew Mrs. Frank and knew me. And as I say, we conversed as I checked him, about 10 or 15 minutes, that morning; and I had no reason to think that at that time there were any mental aberrations." tions."

And at pages 250 to 251:

"Q. Doctor, his hands were affected, weren't they?

"A. Yes.

"Q. His fingers were extended and apart?

"A. More of a normal type of hand. When I saw him, it was always resting. He did not have anything to do with his hands when I was there.

"Q. You know he could not feed himself?

"A. Yes, with small objects. Larger things he could feed himself.

"Q. For instance, you knew he could not pick up a pen or hold a pencil, you knew that?

"A. Yes, sir.

"Q. Now Doctor, when you took his hand, you pressed his fingers together, is that true?

"A. Just like I would shake hands with you, ordinary grasp.

"Q. Now the question I would like to have you answer is, were the fingers extended and apart on his hand, or was his hand perfectly normal like mine?

"A. There was nothing wrong with the formation of his hand. I could shake hands with him. Ordinarily he would give you a grip. He would not shrink with any pain, like he was full of arthritis. It was an ordinary, loose hand.

"Q. When his hand was not grasped, his fingers were apart?

"A. Like if they are laying there, yes."

And at pages 260 to 261:

"Q. There is some question in my mind as to whether or not your testimony in response to the recent question regarding motive power in his right arm and hand was simply that you could form a judgment. You indicated you could form a judgment, Doctor.

"Now in your opinion did Bill Milleman have sufficient motive power in the muscles of his right arm and hand to be able to sign with a pen his name on a piece of paper with the assistance of the hand of another?"

"Mr. Tallent:

"That is objected to as stated. It does not state how much assistance, and the Doctor is not qualified by his own testimony. The only thing he knows about it is that he shook hands with him, and he so stated. He does not know anything about the condition of his arms or his hands and the amount of help necessary is not stated in the question, and for that reason we object."

"Mr. Vesely:

"This is not a hypothetical question. The Doctor already testified that he could give an opinion as to whether this is possible. I am now asking him simply for that opinion."

"The court:

"The objection is overruled and exception is allowed. The witness may answer."

"A. I feel that he would have."

The testimony establishes that decedent had signed his name in the same manner and with exactly the same kind of assistance to checks, income tax returns and other writings since 1955. Many of these checks and other instruments signed by decedent with assistance are in evidence. There is also in evidence petitioners' exhibit 20, a safe deposit box lease signed by testator on April 14, 1947. An accompanying card to this exhibit bearing the same date of April 14, 1947, is

also signed by testator. With this same exhibit is a card surrendering the box, with the signature of the testator signed on October 8, 1952. Part of exhibit 20 is also a new safe deposit box lease signed by testator on October 8, 1952. Attention is directed to these signatures on exhibit 20, which were written by testator prior to 1955, for the reason that prior to 1955, he wrote his name *without* assistance. Petitioners' exhibit 21 is a batch of 19 checks, all of which are signed by testator *with* assistance. Among these checks is one number 109, dated January 2, 1962. All these checks, including check no. 109 which is the last one signed before his death on January 10, 1962, bear a signature of the maker which is patently and convincingly the signature of William P. Milleman, Jr., testator whose will is challenged. The later signatures to checks made in the latter part of 1961, and the check made in January 1962, show that the signatures thereon were written with some difficulty but they are very like the signature of testator which appears on petitioners' exhibit 20, the safe deposit box lease and accompanying cards which testator signed in 1947 and 1952, before he required assistance in the signing of his name. The most important signature in the case is, of course, the one which is signed to the will dated January 6, 1962. The favorable comparison of testator's signature on the challenged will with those on exhibit 20 made prior to the year 1955 is very strong, convincing and conclusive evidence that testator in the case at bar was able to sign his name with assistance. His signature to the will is characteristically his own script in the same form in which he wrote it prior to being disabled and is not the writing of the person who assisted him.

Decedent also signed an earlier will on May 15, 1958, in the same manner as the will of January 6, 1962. A copy of the earlier will is in evidence as exhibit A. The

provisions of the earlier will are nearly identical with those of the contested will. The reason for making the new will was to adjust the disposition of testator's estate to the changes which had occurred in the intervening years. Several legatees in the 1958 will had died and his 400 shares of stock in the American Telephone and Telegraph Company had increased to 1,200 shares by reason of a stock split.

The contestants in the case at bar assert that decedent was both "unable to sign his name or to make his mark" and, therefore, the validity of the execution of the will must be measured by section 2, subsection 3 of the Wills Act of 1947, which requires that the testator's name must be "subscribed in his presence and by his express direction." Contestants do not deny that testator declared the instrument to be his will in the presence of two witnesses "who signed their names to it in his presence." The challenge to the validity of the will, in contestants' theory of the case, rests on the single charge that testator did not expressly direct Mrs. Frank or anyone else to sign his name to the will. Contestants argue that the absence of this express direction fails to meet the essential requirements of section 2, subsection 3 of the Wills Act of 1947, and the will must, therefore, be held to be invalid.

Whether a testator is able to sign his name or make his mark depends solely upon his own decision. See Rosato's Estate, 322 Pa. 229, where the Supreme Court held at page 231:

"As we view the Act, the sufficiency of the reason for not signing his name is for the testator's determination; 'any' reason which moves him not to sign is sufficient, provided there is compliance with the other requisites of the act."

See also Comment of the Joint State Government Commission to section 2, subsection 3 of the Wills Act of 1947.

In the case at bar whether testator wished to sign his name to the will with assistance, which was the manner in which he had been accustomed to sign his name during the preceding six years, was a decision for him to make. If he possessed testamentary capacity and if the making of the will is free from duress, constraint and undue influence, testator had the right to sign his will with the assistance of another. The law of Pennsylvania has long recognized the right of a person afflicted with paralysis, palsy or other inhibiting disability to sign his name to his will with the assistance of another. In Vandruff v. Reinhart, 29 Pa. 232, the Supreme Court held at page 234:

"If one having testamentary capacity, is unable from palsy or other cause to steady his hand so as to make to this will the signature required by law, another person may hold his hand and aid him in so doing; and it is not necessary to prove any express request from the testator for such assistance. The act is his own with the assistance of another, and not the act of another under authority from him. This principle is the only one questioned here. It was rightly decided. Judgment affirmed."

See also Rees v. Stille, 38 Pa. 138, 144; Cozzen's Will, 61 Pa. 196, 201; Hopkin's Estate, 277 Pa. 157; McClure v. Redman, 263 Pa. 405, 409; Williams, Pennsylvania Law of Wills, secs. 62, 68; Bregy, Intestate, Wills and Estates Acts of 1947, p. 2108, sec. 4.

What the Supreme Court held in Brehony v. Brehony, 289 Pa. 267, 270, is apposite to the case at bar. In Brehony the Supreme Court held, pages 270, 271;

"The circumstances attending the execution of the will were these: Testatrix had been blind for some years and had been confined through illness to her room a few days before the will was executed. When about to place her signature on the document she called in her brother William, the principal beneficiary,

to assist. He placed his left arm about her wrist, raised her in bed and with his right hand placed over her right hand wrote her name. Thereafter the subscribing witnesses attested the will as above indicated.

"It is insisted this method of affixing the signature did not comply with our Act of Assembly in that 'the will was not signed at the end thereof.' Whether a testator can write at all makes no difference in determining the validity of a will, nor does it matter whether he is so stricken that he cannot write, or can write only with difficulty. Where testator's mental conception is entirely clear and he desires to sign the will, but his physical powers unassisted will not permit it, and such assistance is called in, the incident of assistance becomes immaterial so long as there is a conscious wish of the testator that his hand should make the signature. His participation in the slightest degree, or acquiescence in or adoption of the signature is sufficient: McClure v. Redman, 263 Pa. 405, 411, 412; Fritz v. Turner, 46 N. J. Eq. 515, 22 Atl. 125; Kearney's Will, 74 N. Y. S. 1045. Therefore, it makes no difference whether this will was signed by Mary Brehony herself with the aid of her brother, or by William Brehony at her request, as long as the signature was adopted and legal proof is present: Hughes's Est., 286 Pa. 466, 460, et seq."

The uncontradicted medical testimony in the case at bar is that testator possessed sufficient muscular power on January 6, 1962, to sign his name to the will with the assistance of another. He signed the will in the same manner and form in which he had signed other instruments for many years. The pen was in his hand and the signature was written by him in his characteristic style with the hand of Mrs. Frank superimposed upon the hand of testator.

The hearing judge holds that testator's signature was subscribed by him in full compliance with the pro-

visions of the first paragraph of section 2 of the Wills Act of 1917, which requires that the will "shall be signed by the testator at the end thereof, . . . ." The case at bar is not governed by the provision of section 2(3) of the Wills Act of 1947, entitled "Signature by another."

The will was validly signed.

Did testator possess testamentary capacity? The definition of "testamentary capacity" is well settled.

A man possesses testamentary capacity when he is of sound mind and disposing memory, has a full and intelligent knowledge of the act that he is engaged in, a full knowledge of the property he possesses, and an intellgent perception and understanding of the disposition he desires to make of it and of the persons and objects he desires shall be the recipients of his bounty: Williams v. McCarroll, 374 Pa. 281.

Physical debility or weakness, sickness or other physical infirmity does not affect capacity to make a will if sufficient intelligence remains: Thompson vs. Kyner 65 Pa. 368 (1870).

The determinative time to be considered is at the very time of the execution of the will: Hall Will, 402 Pa. 212, 166 A. 2d 644 (1961).

The will in the case at bar was signed by testator about 2 p.m. on January 6, 1962, in the presence of the two subscribing witnesses. Mrs. Marie R. Frank, a practical nurse, one of the beneficiaries of the will, was also present and assisted the testator in his signing of the will. Strong, compelling and clear evidence is required to overcome the presumption of testamentary capacity: Sturgeon Will, 357 Pa. 75. The testimony relied upon by the contestants to prove incapacity was very weak and inconclusive. It consisted principally of the statements of friends and neighbors of decedent that he was drowsy and would go to sleep when they visited him. This was the testimony of Mr.

Ritter, Mrs. Scutelis, Mrs. Ritter and Messrs. Bitsch-ley, Sloan, Williams and Steigerwald. However, all these witnesses testified that decedent recognized them and spoke to them when they called upon him during the last week of his life. Mr. Dewey Marshall testified that he went to decedent's home in the early afternoon of January 6, 1962, with Reverend Larson of the First United Presbyterian Church of Allegheny who gave communion to testator. Mrs. Bruckner, who saw testa-tor frequently during the last two weeks of his life, testified that testator always recognized her and asked about "Whitey," her dog. Mr. Osborn, the postman, testified that testator recognized him and spoke to him on January 8, 1962, two days before his death. The testimony submitted by the contestants is insufficient in law to support a finding of lack of testamentary capac-ity. This is particularly so when the subscribing wit-nesses to the will, who were present at the execution of the instrument, and the physician, who attended testator on the morning of the same day, testified that decedent knew exactly what he was doing, the extent and nature of his property and the identity of his bene-ficiaries. One of the subscribing witnesses is the scrive-ner of the will, Ira C. Houck, Jr., Esq. The other subscribing witness is John A. Hunter, Jr., a repu-table business man. Dr. Wirts, the physician who attended testator on the day the will was signed, is a very reputable physician who has practiced medi-cine for 30 years. The presumption of testamentary capacity, supported by the clear, direct and unequivocal testimony of the subscribing witnesses and the attend-ing physician, was not overcome by the testimony offered by the contestants. See Masciantonio Will, 392 Pa. 362, 379; Campo Estate, 23 D. & C. 2d 1, 5, 15; Sturgeon Will, supra, p. 82.

Is the will the result of undue influence and duress?

The contestants allege that the will "was procured

by undue influence, duress and constraint practiced on the decedent by Marie R. Frank, one of the legatees named in said will."

Mrs. Frank was a practical nurse who was employed by testator from 1955 until his death in 1962. Mrs. Wilk, the other nurse, was employed from 1957 to 1962. Dr. Wirts testified concerning their work as follows, official notes of testimony, p. 263:

"Q. Did you have an opportunity to see what kind of work they did?

"A. I think it was excellent.

"Q. Did Mr. Milleman express any appreciation or gratitude to you about these ladies and the work they did for him?

"A. No. I don't think that point came up.

"Q. Do you think he was satisfied with what they did for him?

"A. I think they did a wonderful job for him."

Before the court could find that undue influence was exercised by Mrs. Frank on testator, the evidence would have to establish that there was "imprisonment of mind or body, fraud, threats or misrepresentations or circumvention or inordinate flattery or physical or moral coercion to such a degree as to prejudice the mind of testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will." See Koons Estate, 293 Pa. 465; Olshefski's Estate, 337 Pa. 420; Williams v. McCarroll, 374 Pa. 281; Roberts Will, 373 Pa. 7. The constraint must be operative at the very time of the making of the will: Hoffman Estate, 394 Pa. 391.

Where the will is prepared by decedent's lawyer at decedent's request and in accordance with his instructions, there is a presumption and an inference that the will was properly made by a person having testamentary capacity and free of undue influence: Farmer Will, 385 Pa. 486, 491.

Decedent was a good-humored man given to joking with others. One of the physicians who testified stated that "euphoria" or a feeling of well-being accompanies the disease of multiple sclerosis. The mere fact that on occasion decedent would refer to Mrs. Frank as "the boss" is of no significance.

It should be marked that the legacy of Mrs. Frank in the 1962 will is the same as in the 1958 will, taking into account the three for one split of the shares of the American Telephone and Telegraph Company. The gifts of shares to other legatees were similarly increased to give effect to the split.

The testimony and the evidence offered by the contestants is insufficient in law to prove that undue influence was exercised by Mrs. Frank on testator at the time of the making of the will or at any other time.

The testimony and evidence also fall short of establishing a confidential relationship between decedent and Mrs. Frank. The mere fact that she nursed him and paid his bills with cash which he gave her for the purpose does not establish a confidential relationship. As was held in Farmer Will, supra, at page 491:

". . . We held in Llewellyn's Estate, 296 Pa. 74, 145 A 810, that the fact that proponent drew checks, paid bills and slept in the same room with decedent to take care of him, did not establish a confidential relationship. These contestants' proof is far less. Mere kinship certainly does not establish the relation, and her dependency on him, which was slight, did not 'necessarily beget a confidential relation, indeed, it may be quite the reverse' . . ."

See also Thompson Will, 387 Pa. 82, 99, where it is held:

" 'Weakness, dependence or trust *justifiably reposed*' is not created merely by nursing and caring for an old sick lady; that language or yardstick refers to and requires a relationship which involves or includes

managing or advising a dependent person in business or financial matters: cf. Brennan's Estate, 312 Pa. 335, 168 A. 25; Rover's Estate, 339 Pa. 423, 12 A. 2d 923."

And at page 100:

"Opportunity for undue influence, suspicion and conjecture, do not create or amount to proof of either confidential relationship or undue influence: May v. Fidelity Trust Co., 375 Pa. 135, 99 A. 2d 880; Rosenthal's Estate, 339 Pa. 488, 496, 15 A. 2d 370. See also: Zakatoff Will, 367 Pa. 542, 546, 81 A. 2d 430; Obici v. Third Nat. Bank & Trust Co. of Scranton, 381 Pa. 184, 190, 112 A. 2d 94. In Rosenthal's Estate, 339 Pa. supra, the Court said (p. 496): ' " ' . . . opportunity is not evidence and conjecture and suspicion do not take the place of testimony. ' " ' "

See also Minnie McCarthy Estate, 40 Erie 192.

The proof offered by the contestants to establish a confidential relationship was insufficient to shift the burden of proof. See May v. Fidelity Trust Company, 375 Pa. 135, 144-5.

A decree will be entered dismissing the appeal from the decree of the register of wills admitting the will to probate.

### Decree

And now, May 14, 1963, upon consideration of the above entitled case, it is ordered, adjudged and decreed that the appeal of R. E. Milleman and Jeanetta F. Brown from the decree of the register of wills entered January 16, 1962, admitting to probate as the last will and testament of William P. Milleman, Jr., a paper writing dated January 6, 1962, is hereby dismissed.

This decree will become absolute unless exceptions are filed within 10 days.